813 A.2d 1145

ATTORNEY GRIEVANCE COMMISSION,

v.

Thomas Joseph McLAUGHLIN.

Misc. Docket AG No. 22, Sept. Term, 2001.

Court of Appeals of Maryland.

Dec. 24, 2002.

468

Melvin Hirshman, Bar Counsel and John C. Broderick, Assistant Bar Counsel for the Attorney Grievance Commission of Maryland, for Petitioner.

Lawrence P. Pinno, Jr., and Thomas J. McLaughlin, Bel Air, for Respondent.

BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, and BATTAGLIA, JJ.

BATTAGLIA, Judge.

The respondent, Thomas J. McLaughlin (hereinafter "McLaughlin" or "respondent") was admitted to the Bar of this Court on June 18, 1987. On September 12, 2001, the Attorney Grievance Commission of Maryland (hereinafter "Bar Counsel"), acting pursuant to Maryland Rule 16–709(a), filed a petition for disciplinary action against McLaughlin charging numerous violations of the Maryland Rules of Professional Conduct (hereinafter "MRPC"),[1] including MRPC 1.4

---

1. Rule 16–709(a) states that "charges against an attorney shall be filed by the Bar Counsel acting at the direction of the Review Board." This case arose and was processed under the attorney grievance rules in effect on June 30, 2001, as they were stated in the 2001 edition of the Maryland Rules pursuant to our order adopting the new Attorney Grievance Rules, in which we specifically "ORDERED ... [T]hat any matter pending before an Inquiry Panel, the Review Board, or the Court of Appeals pursuant to charges, a petition, or an application pending as of June 30, 2001 shall continue to be governed by the Rules

(Communication),[2] MRPC 1.5 (Fees),[3] MRPC 1.7 (Conflict of

in effect on June 30, 2001;" Md. Rules Orders, p. 56, Maryland Rules of Procedure, vol.1 (2002).

What was formerly included in Rule 16–709 is now dispersed throughout different rules in the 2002 edition.

**2.** MRPC 1.4 provides:

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

**3.** MRPC 1.5 provides:

(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

(b) When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation.

(c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. The terms of a contingent fee agreement shall be communicated to the client in writing. The communication shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and, if there is a recovery, showing the remittance to the client and the method of its determination.

Interest),[1] MRPC 1.8(a) (Conflict of Interest: Prohibited Transactions),[5] MRPC 1.15 (Safekeeping Property),[6] MRPC

(d) A lawyer shall not enter into an arrangement for, charge, or collect:

(1) any fee in a domestic relations matter, the payment or amount of which is contingent upon the securing of a divorce or custody of a child or upon the amount of alimony or support or property settlement, or upon the amount of an award pursuant to Sections 8–201 through 213 of Family Law Article, Annotated Code of Maryland; or

(2) a contingent fee for representing a defendant in a criminal matter.

(e) A division of fee between lawyers who are not in the same firm may be made only if:

(1) the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation;

(2) the client is advised of and does not object to the participation of all the lawyers involved; and

(3) the total fee is reasonable.

4.  MRPC 1.7(b) provides:

A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation.

5.  MRPC 1.8(a) provides:

(a) A lawyer shall not enter into a business, financial or property transaction with a client unless:

(1) the transaction is fair and equitable to the client; and

(2) the client is advised to seek the advice of independent counsel in the transaction and is given a reasonable opportunity to do so.

6.  MRPC 1.15 provides:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the

1.16(d) (Declining or Terminating Representation),[7] MRPC 8.4(b),(c) & (d) (Misconduct),[8] Maryland Code, Section 10–304 of the Business Occupations and Professions Article (1989, 2000 Repl.Vol.) (Deposit of Trust Money),[9] Section 10–306 of the Business Occupations and Professions Article (1989, 2000

client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

7. MRPC 1.16(d) states:

(d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law.

8. MRPC 8.4 provides in relevant part:

It is professional misconduct for a lawyer to:

\* \* \*

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice.

8.4(b), although cited in the petition for disciplinary action, was abandoned by the petitioner and not considered by the hearing judge and will not be discussed further.

9. Section 10–304 states:

(a) *General requirement.*-Except as provided in subsection (b) of this section, a lawyer expeditiously shall deposit trust money into an attorney trust account.

(b) *Exceptions—Direction of court.*-Subsection (a) of this section does not apply if there is a court order to the contrary.

(c) *Same–Real estate transaction.*-Notwithstanding subsection (a) of this section or any other law, a lawyer may disburse, at settlement in a real estate transaction, trust money that the lawyer receives in the transaction.

Repl.Vol.)(Misuse of Trust Money),[10] and Section 19–346(n) of the Health–General Article (1982, 2000 Repl.Vol.).[11]

The charges involved numerous financial arrangements that McLaughlin had with Scott Perkins (hereinafter "Perkins"), Glennys R. Wise (hereinafter "Wise"), Roland Burker (hereinafter "Burker"), Arlene M. Glomp (hereinafter "Glomp"), and

---

10. Section 10–306 states:

A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer.

11. Section 19–346 provides in relevant part:

(a) *Definitions.-*

(1) In this section the following words have the meanings indicated.

(2) "Abuse of funds" means using the assets or income of a resident:

(i) Against the express wish of the resident, if the expenditure was not necessary for the direct and immediate benefit and welfare of the resident; or

(ii) For the use or benefit of a person other than the resident if the expenditure is not also for the direct and immediate benefit of the resident or consistent with an express wish and past behavior of the resident.

(3) "Bank" means a bank, trust company, savings bank, or savings and loan association that:

(i) Is authorized to do business in this State; and

(ii) Is insured by the Federal Deposit Insurance Corporation, Federal Savings and Loan Insurance Corporation, or the State of Maryland Deposit Insurance Fund Corporation.

(4) "Facility" means:

(i) A hospital that is classified as a special hospital; or

(ii) A related institution.

(b) *Scope of section.-*This section provides rights and remedies in addition to, and not in derogation of, any right or remedy that a resident of a facility has under any other law.

(c) *Control over financial transactions.-*Each resident of a facility may:

(1) Keep control over personal financial transactions unless:

(i) A court adjudicates the resident as a disabled person, in accordance with Title 13 of the Estates and Trusts Article; or

(ii) The Social Security Administration designates a representative payee to receive the Social Security funds for the use and benefit of the resident; and

(2) Choose any person, including the administrator of the facility or a designee of the administrator, to handle the financial transactions.

(n) *Misuse prohibited.* -

(1) A person, including the legal representative of the resident, may not use the assets or income of a resident for any purpose that is not authorized by the resident, a designee or legal representative, including a representative payee of the resident.

Mariner Health of Bel Air (hereinafter "Mariner Health") from July of 1998 and throughout 1999. This Court referred the petition to Judge Robert N. Dugan of the Circuit Court for Baltimore County for a hearing to determine findings of fact and conclusions of law pursuant to Maryland Rule 16–706(b).

The subsequent procedural history of this matter was summarized by Judge Dugan as follows:

Respondent was served with the Writ of Summons, the transmittal Order of the Court of Appeals and the Petition for Disciplinary Action. On November 16, 2001, Respondent filed a general denial plea.

Upon Petitioner's Motion to Extend Time Within Which to Conduct a Hearing and without objection by Respondent, the Court of Appeals extended the hearing date to January 25, 2002. On December 13, 2001, Petitioner propounded upon Respondent both Interrogatories and a Request for Admissions of Fact. Respondent filed a Motion to Shorten Time and a Motion to Strike Appearance which were argued in this Court on January 18, 2002. Because a granting of the Motion to Strike appearance would then necessitate a request for a continuance by the Respondent and such a request could only be entertained by the Court of Appeals, this Court suggested that Respondent file said motions with the Appellate Court. Subsequently, the Court of Appeals granted the Motion to Strike Appearance of Respondent's counsel and extended the hearing date to March 5, 2002. Due to Respondent's failure to respond to Petitioner's discovery requests, Petitioner filed a Motion for Sanctions. In turn, Respondent then filed a Motion for Continuance to the Court of Appeals on March 5, 2002, which was later denied. Consequently, a hearing on the merits commenced before this Court on March 5, 2002.

During the hearing on March 5, 2002, at which McLaughlin represented himself, Bar Counsel introduced admissions of fact, which had been deemed admitted by McLaughlin because he had failed to respond to them. The transcript of the

deposition of Jason Frank, who had been called as an expert in "elder law," with attendant exhibits, was admitted without objection. Respondent offered no evidence to contradict the admissions of fact during the hearing, although upon a post-hearing motion, he had been permitted to file, by April 15, 2002, a memorandum in answer to the admissions of fact. McLaughlin, however, failed to file any memorandum in answer to the admissions of fact as of April 22, 2002, the date of Judge Dugan's Opinion. That opinion was filed in the Circuit Court on April 30, 2002 and in this Court on May 24, 2002. Accordingly, the following facts, which were admitted on March 5, 2002, were deemed accurate and true:

1. The Respondent concentrates his area of practice in medical assistance eligibility for long term care benefits.

2. In order for an applicant to be eligible for Medical Assistance Long Term Care Benefits, the applicant must meet three eligibility requirements: technical, financial and medical.

3. The basic financial eligibility criteria are: (1) countable resources must be $2,500 or less and (2) income must be insufficient to meet the costs of care.

4. The Respondent's efforts were concentrated to assist his clients in preserving, protecting, or otherwise disposing of their personal assets in such a way as to maximize the distribution of those assets to heirs, beneficiaries and family members and still be eligible to receive medical assistance under the appropriate federal and state laws and regulations.

5. In furtherance of the Respondent's practice to assist his clients in the protection, preservation and distribution of their personal assets, he attempted to utilize various planning techniques which collectively he termed an 'asset protection plan.'

6. Respondent, in connection with his representation of clients seeking "protection of assets as a result of entry into a nursing facility and the need to qualify for medicaid for nursing home payment," uses a multiple

page fee agreement that, in essence, breaks down the overall fee into two subcategories.

7. The first category or portion of the fee is termed a "design engagement fee" or "design fee." The design fee is a set fee that will vary from client to client, which serves to pay the Respondent "for the initial investigation and advice" in connection with his preparation of an asset protection plan.

8. Pursuant to the terms of the agreement, an "asset protection plan" is to be provided to the client at the completion of that stage.

9. The second portion, or subcategory, of the fee is termed an "implementation engagement fee" or "implementation fee." That fee is characterized as a "contingent, sliding scale" fee which the Respondent bases "on a set percentage of the protected savings" which he determines to be applicable under the asset protection plan which he proposed.

10. The implementation fee is a percentage, usually twenty-five percent (25%) of the savings estimated by the Respondent to be achieved under his proposed asset protection plan.

11. Respondent, by the terms of his fee agreement, deems "all fees under [that] agreement are earned when paid" and deposits of such fees are to be made into his operating account, rather than his escrow account.

12. Respondent, by the terms of his fee agreement, acknowledges there are circumstances that would require the return of the fee charged against, and collected from, the client. Even when it is acknowledged the fee should be returned due to the inability to qualify the client for medicaid, the Respondent may exercise "the option of returning the funds within thirty days with no interest OR returning the funds within a longer period of time at ten percent (10%)/year of interest, essentially granting himself loan of those funds.

13. In or about July, 1992, Loretta S. Perkins suffered a cerebral stroke which left her with significant left side deficits and subsequent life long disability.

14. Her husband, Toney R. Perkins was her caretaker from that event until his death in December, 1998.

15. In February, 1998, Mr. Perkins was diagnosed with colon cancer and underwent surgery, chemotherapy and radiotherapy. With this subsequent debilitation full time care givers were hired and the need for long term planning became more obvious.

16. Consequently, the Perkins, through their son, Scott Perkins, initiated contacts with the Respondent and entered into a fee arrangement with him on or about November 23, 1998.

17. The fee agreement between the Respondent and Toney Rodney Perkins and Loretta Sue Perkins established a $9,000 design fee and a twenty-five percent (25%) implementation fee to be applied towards the savings from the asset protection plan called for under the fee agreement.

18. On or about December 22, 1998 Toney R. Perkins paid to Respondent, by check number 2371, the amount of $5,000 as a design fee.

19. Anthony Perkins died on December 23, 1998.

20. By letter dated February 15, 1999 the Respondent proposed certain changes to the fee agreement of November 23, 1998, that, *inter alia,* called for an additional payment of $35,000, bringing the total fee to $40,000. This amendment was accepted by Scott Perkins as attorney-in-fact for his mother, Loretta Sue Perkins.

21. By check dated February 25, 1999 Scott Perkins paid $35,000 to the Respondent as the balance due under the fee agreement.

22. By letter of complaint dated October 18, 1999, Scott Perkins brought Respondent's conduct to the attention

of the petitioner and alleged that Respondent had failed to perform any appreciable services in return for the payment of $40,000, failed to provide any asset protection plan, failed to implement any plan, or to undertake any positive action on behalf of Loretta S. Perkins.

23. Respondent was made aware that Loretta Perkins, after the death of her husband, had no intention of entering into a nursing home and that any "asset protection plan" would never, therefore, be needed, let alone ever implemented.

24. Although the Respondent had indicated to Scott Perkins, acting under power of attorney for Loretta S. Perkins, that he would return the entire $40,000 fee should Ms. Perkins be unwilling to ever enter a nursing home, the Respondent failed to return any portion of the fee.

25. Between February 1999, and October 18, 1999, when he filed his complaint with the Attorney Grievance Commission, Scott Perkins made numerous attempts to discuss the subject matter of the legal representation with the Respondent and the Respondent failed to respond to those efforts to obtain information by Ms. Perkins.

26. After numerous requests for a refund by Scott Perkins, on behalf of his mother, to which Respondent made no substantive response, eventually by October, 1999, Respondent agree to return the fee at the rate of $750 a month to include payments of ten percent (10%) interest on the $40,000 fee.

27. Respondent's representation of the contrary notwithstanding, he has failed to refund or return any of the unearned fees of Loretta S. Perkins and misappropriated those funds for his own personal and business purposes.

28. Respondent exhausted those funds so that they were unavailable to be returned to his clients.

29. The Respondent failed to render any appreciable legal services on behalf of Loretta S. and Toney R. Perkins.

30. Respondent failed to deposit the fees paid on behalf of Toney R. and Loretta S. Perkins in a fiduciary or escrow account.

31. Respondent failed to return the unearned portions of those fees.

32. Respondent failed to advise his clients that they should consult with counsel before entering into a retainer agreement with him which, in substantial part, constitutes the provisions of an unsecured loan document and therefore a business transaction between he and his clients.

33. In or about July, 1998, Glennys R. Wise engaged the Respondent to qualify her mother, Irene Ellsworth, and her aunt, Edna Terhall, for medical assistance. At that time both women were residents of Hamilton Center, Genesis Elder Care.

34. The Respondent charged Ms. Wise a fee of $12,000 to qualify the women and ascertained there was a financial disqualification due to the excess resources they held. Respondent identified $21,530 to be excess resources otherwise disqualifying his clients from medical assistance.

35. The Respondent, as part of his asset protection plan, had Ms. Wise, her mother and her aunt turn over $21,530 to him to be held in his escrow account as agent for the nursing home.

36. The Respondent was aware or at least contended that his clients owed the nursing home an amount in excess of $21,530 and proposed to "negotiate" with the nursing home against their existing bill with the $21,530 entrusted to him.

37. The Respondent failed to notify the nursing home that he was holding $21,530 on their behalf as his principal,

and nonetheless purported to negotiate with them to their detriment or adverse interest.

38. Irene Ellsworth, the mother of the Complainant, died on March 12, 1999.

39. In or about July 1999, the Department of Social Services ruled that the $21,500 held in the Respondent's escrow account was in fact available to Irene and Edna and, therefore, effectively rendered them ineligible for medical assistance. Although Respondent was made aware that the Department of Social Services rejected benefits in favor of his clients in July 1999, due to their determination that the funds he maintained in escrow were available to them, he failed to pay those funds over to the nursing home until October 1999.

40. Respondent failed to substantively perform any services of any appreciable value for the benefit of Ms. Wise, her mother or her aunt.

41. Respondent failed to refund any unearned fees as demanded by Ms. Wise.

42. Respondent failed to advise his clients to seek the advice of counsel before entering into a retainer agreement with him which, in substantial part, constitutes the provisions of an unsecured loan document and, therefore, a business transaction with his clients.

43. Respondent deposited the $12,000 retainer fee in his operating account and failed to separately maintain those funds as fiduciary funds separate and apart from his own. He, in fact, used those funds for his own purposes and exhausted those funds so that they were not available to be refunded to his clients.

44. On or about October 25, 1999 Roland Burker and his wife met with Respondent to pursue obtaining an asset protection plan for the benefit of Mary G. McNulty, Complainant's sister, for whom they had power of attorney.

45. Respondent assured Mr. Burker and his wife he could protect at least $60,000 of these assets of Ms. McNulty.

46. Mr. Burker and his wife met with Respondent on November 8th and at that time were presented with a retainer agreement which they executed on that date. The retainer agreement called for a design fee of $10,000 and an implementation fee of twenty-five percent (25%) of savings.

47. During that meeting Mr. Burker inquired of the Respondent when the design fee should be paid and the Respondent indicated that day. At that time a follow-up appointment was established for November 15th and Mr. Burker and his wife left the office.

48. After leaving the office Mr. Burker arrived at his home and was, within thirty minutes, met there by Respondent's assistant who was dispatched to obtain Mr. Burker's personal check in the amount of $10,000 for the design fee.

49. Although a copy of the retainer agreement was to have been provided at that time, the assistant failed to bring the executed document.

50. The following day, November 9th, at approximately 11:00 a.m. after returning to their residence, Mr. Burker reviewed his answering machine, which contained a message from the teller at his bank branch. The message was left in an attempt to verify the validity of a check presented for payment and, in the background, a man's voice was heard to say that he was the attorney of the account holder. The teller's message went on to say that the call should be disregarded and terminated at that time.

51. A second message was on the machine indicating that the teller required Mr. Burker to call her upon his return.

52. Mr. Burker contacted the teller and was informed that the Respondent had appeared at the bank and wanted

to negotiate the $10,000 check from Mr. Burker and have the teller issue a cashiers check in that amount.

53. Mr. Burker, alarmed that his check was so quickly negotiated and concerned for the propriety of the transaction, contacted the Respondent. At that time the Respondent indicated that he "needed the funds because of his cash flow problems."

54. Upon hearing this representation Mr. Burker immediately decided to terminate the representation and went to the Respondent's office the next morning to obtain a copy of the retainer agreement and a receipt for the funds. He immediately wrote a letter to the Respondent rescinding the retainer agreement, discharging the Respondent and asking for a one hundred percent (100%) refund of the design fee.

55. Mr. Burker took that letter with him to the scheduled appointment on November 15th but was informed that the Respondent could not be present at the meeting. He left the discharge letter at the office at that time.

56. On November 30th the Respondent contacted Mr. Burker after Mr. Burker's efforts to contact him had been unsuccessful, and acknowledged that he had done nothing to earn the $10,000 fee and would return the entire amount.

57. He went on to inform Mr. Burker that he had, pursuant to his retainer agreement, thirty days to decide whether or not to repay the fee in full or to pay at ten percent (10%) interest per year over a longer period of time. Respondent gave Mr. Burker an appointment for December 6th at 4:00 p.m. to render his decision as to the repayment policy he would adopt.

58. On December 6th Respondent met with Mr. Burker and informed him that he was exercising his option to pay the $10,000 at a rate of $500 per month, gave Mr. Burker the first check for $500 and informed him that he would provide Mr. Burker with an amortization

schedule and another check in or about December 31, 1999 and monthly thereafter.

59. The Respondent failed to timely make the payments of $500 per month and, in fact, has not made any additional payments.

60. The Respondent, at the time that he promised to repay the $10,000 with interest, was aware that he did not have the ability to make those payments nor did he have any expectation of being able to make those payments.

61. At the time the Respondent took Mr. Burker's $10,000 he knew that he would, and did, expend all of those funds on his own personal and professional purposes and would be without any reliable source of repayment.

62. The Respondent failed to refund unearned fees.

63. Respondent failed to deposit unearned fees in a fiduciary account.

64. Respondent failed to safeguard the property of his client.

65. Respondent failed to advise his clients to consult with counsel before entering into a retainer agreement which essentially established a business transaction between he and his clients in the form of an unsecured loan.

66. In or about August 1999 Arlene M. Glomp and her two brothers met with Respondent to consider the financial eligibility of their mother for long term continuous care and the possibility of preserving some of her assets, which approximated $200,000 to $220,000. The initial meeting with the Respondent was to be a free consultation to discuss with the family, with some specificity, what his services would include and what possibilities they may pursue.

67. At a second meeting later in August 1999 or early September 1999, the family members met with Respondent again and executed a retainer agreement

without having been advised of their right to consult counsel about various terms and conditions within the retainer agreement.

68. Pursuant to that agreement they were requested to provide a design fee in the amount of $10,000, which was paid.

69. Thereafter Respondent met with Ms. Glomp on approximately two separate occasions and on one occasion, which took place at the nursing care facility, his secretary delivered a power of attorney document for the benefit of Ms. Glomp's mother, a patient there.

70. The Respondent met with Ms. Glomp only one additional time in late September that included a one-half hour session with a financial planner and a brief meeting in October.

71. Thereafter no substantive work was done by the Respondent nor was there any communication with Ms. Glomp and her family about the asset protection plan and its progress or lack thereof.

72. Ms. Glomp's mother died on December 21, 1999 and thereafter the Respondent was notified of her demise and requested to return the unearned portion of the fees, which Ms. Glomp expected would be substantial since she saw no work product.

73. Although Ms. Glomp had not been presented with an asset protection plan the Respondent persisted in attempting to collect a $16,000 implementation fee which he contended was due.

74. Ms. Glomp refused to pay any additional funds because she never did receive an asset protection plan.

75. Despite numerous requests for a refund, the Respondent failed to return any of the unearned portions of his fee.

76. Respondent failed to respond to requests for information by his client in connection with the legal matter for which he was retained.

77. Respondent failed to safeguard the funds of his client by depositing those funds in an escrow account.

78. Respondent exhausted all funds entrusted to him by Ms. Glomp for his own personal and professional purposes.

79. On or about April 8, 1999 the Respondent entered into a financial agreement with Mariner Health of Bel Air as the agent for a resident in that health care facility, his mother, Anne McLaughlin.

80. The Respondent executed the agreement as agent under a financial power of attorney granted to him by his mother and represented to the facility that she had third party insurance through Transport Life—Conseco from whom he agreed to make payments on her behalf to the facility. In the agreement the Respondent executed as agent on behalf of his mother he acknowledged the misuse of assets or income of the resident is a misdemeanor subject to fine up to $10,000 and considered an "abuse of funds."

81. The Respondent contacted Transport Life—Conseco and instructed the insurance company to remit future payments on behalf of his mother to him personally rather than to the health care facility, Mariner Health of Bel Air, Inc. As a result, Respondent came into possession of approximately $28,000 of funds from the insurance company attributable to the care and expenses incurred on behalf of his mother by Mariner Health of Bel Air, Inc.

82. The Respondent exercised control, pursuant to a power of attorney, over his mother's checking account and funds and transferred $22,000 from his mother's checking account to his own personal account or to his law firm's operating account.

83. The Respondent misappropriated the funds and assets of his mother over which he exercised a fiduciary obligation under a power of attorney and used those funds for his own personal, professional or familiar

purposes other than the expenses for the care of his mother for which they were intended.

In assessing these facts, Judge Dugan made the following conclusions of law:

## CONCLUSIONS OF LAW

Rule 1.4 of the Maryland Professional Rules of Conduct provide that "a lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information." By failing to respond to Scott Perkins's numerous attempts to discuss the status of his mother's asset protection plan, for which Respondent was hired to prepare, Mr. McLaughlin clearly violated the ethical duty required by Rule 1.4. Similarly, after being hired by Arlene Glomp and her brothers to consider "the financial eligibility of their mother for long term continuous care and the possibility of preserving some of her assets," McLaughlin failed to communicate with his clients about his progress on the asset protection plan. Thus, the Court finds that, as to both cases, Respondent was in violation of the Maryland Code of Ethics.

It is clear from the facts that Mr. McLaughlin, in violation of Maryland Rule of Professional Conduct 1.5(a) which requires a lawyer's fee be reasonable, charged an exorbitantly excessive fee in each of the four cases at issue. Among the factors to be considered when determining whether a fee is reasonable is the amount of work involved and the results obtained. Respondent did not provide any of his clients with the asset plans he was hired to produce and for this failure to render any appreciable legal services he collected and retained fees in excess of $72,000. By charging and keeping these fees for work that he knew he had not done and, clearly, did not plan to do, Respondent also violated Maryland Rule of Professional Conduct 8.4(c) prohibiting a lawyer from engaging in conduct involving "dishonesty, fraud, deceit or misrepresentation."

The ethical Rule addressing the safekeeping of property, found at Maryland Professional Rule of Conduct 1.15, re-

quires a lawyer to "hold property of clients that are in [his or her] possession in connection with a representation separate from the lawyer's own property" and to keep such funds "in a separate account. . . ." Further, the Business Occupations and Professions Article of the Maryland Annotated Code, Sections 10–304 and 306 mandate that client trust funds must be deposited in a separate trust account and that a lawyer "may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer." By depositing the retainer fees charged to each of his clients into his operating account and, thus, failing to keep such monies separate and apart from his own and by negotiating Mr. Burker's $10,000 retainer fee into a cashiers check for his own use rather than placing it into a trust account, Respondent clearly violated Rule 1.15 and Section 10–304 of the Business Occupations and Professions Article. Mr. McLaughlin dug the hole even deeper by exhausting the fees, charged for work not performed, for his own personal and professional purposes. In violation of Section 10–306 of the Business Occupations and Professions Article, Mr. McLaughlin, without question, misappropriated the funds with which he was entrusted.

Lawyers are clearly prohibited from entering into attorney-client relationships where such representation will result in a conflict of interest with another client and are, as well, prohibited from entering into business, financial or property transactions with a client unless "the transaction is fair and equitable to the client" and "the client is advised to seek the advice of independent counsel in the transaction and is given a reasonable opportunity to do so." Maryland Rules of Professional Conduct 1.7, 1.8. By the terms of Respondent's standard fee agreement with each of the four clients in this case, it is recognized that there are particular circumstances under which the fee charged and collected should be returned. Even where the client fails to qualify for medicaid and an asset plan cannot be prepared, the Respondent is permitted to exercise one of two options when refunding the fees retained: he may return the funds

within thirty days with no interest or return the funds over a longer period of time at a ten percent (10%) interest per year. It is the second option which essentially transforms the attorney-client relationship into a business transaction whereby Mr. McLaughlin is granted a loan that may be repaid over a period of time that is governed by his sole discretion. None of his clients were advised that they should seek the advise of additional counsel before entering into such an agreement nor were they given an opportunity to do so. It is, as well, debatable whether such a contract is fair and equitable to each of the clients. Consequently, Respondent created a business relationship with his clients in violation of the ethical Rules.

Upon the termination of representation, a lawyer "shall take steps to the extent reasonably practicable to protect a client's interest, such as ... surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. Respondent acted in contravention of this Rule when he failed to return to his clients property to which they were entitled, including a refund of advanced payment of fees that he did not earn.

Finally, Respondent impermissibly and improperly retained the $28,000 paid to him by Transport Life—Conseco as part of the payments due and owing to the health care facility, Mariner Health of Bel Air, Inc., pursuant to its insurance contract. As agent for his mother, Respondent was obligated to pay third party insurance that was received on her behalf to the facility. Yet, in direct violation of this agreement, Mr. McLaughlin illegally kept them for his own use and did not place them in a separate trust account. Not only does this violate the Health and General Article of the Annotated Code of Maryland, Section 19–346(n) which prohibits an attorney from using the assets or income of a resident of a health care facility for any purpose that is not authorized by the resident, designee or legal representative, but also Maryland Professional Rules of Conduct 1.15(a) for his failure to place the funds in a separate trust account,

8.4(c) and (d) for his dishonest, fraudulent and deceitful misconduct that has been prejudicial to the administration of justice and Business Occupations and Professions Article, Section 10–304 and 306 for using trust funds in a manner other than which they were intended. Rule 8.4(b), although cited in the complaint as being violated by the retention of the $28,000, was not charged and has thus been abandoned by the Petitioner.

Judge Dugan, thus, determined that McLaughlin's acts and omissions constituted violations of MRPC 1.4 (Perkins and Glomp matters); MRPC 1.5(a) (Perkins, Glomp, Wise and Burker matters); MRPC 1.15 and Sections 10–304 and 306 of the Business Occupations and Professions Article (Perkins, Glomp, Wise and Burker matters); MRPC 1.7 and MRPC 1.8 (Perkins, Glomp, Wise and Burker matters); MRPC 1.16(d) (Perkins, Glomp, Wise and Burker matters); MRPC 1.15(a), MRPC 8.4(c), MRPC 8.4(d) and Sections 10–304 and 10–306 of the Business Occupations and Professions Article, and Section 19–346(n) of the Health–General Article (Mariner Health matter).

Bar Counsel took no exceptions to Judge Dugan's findings of fact and conclusions of law and recommended McLaughlin's disbarment.

On August 5, 2002, McLaughlin filed in this Court a motion to remand to which Bar Counsel filed an opposition. That motion was denied by this Court on August 21, 2002.[12] Represented by new counsel, McLaughlin, on October 28, 2002, filed a motion asking the Court to reconsider the motion to remand. On that same day, McLaughlin also filed a motion to extend time *Nunc Pro Tunc*, in which he sought an extension of time for filing exceptions to the findings of fact and conclusions of law. He appended proposed exceptions to the motion. Those proposed exceptions alleged that McLaughlin had been suffer-

---

12. The motion requested a remand to the Circuit Court for Baltimore County for Judge Dugan to rule on motions to reopen hearings, to strike, and opposition to strike/withdraw admissions of facts that had been filed on April 29, 2002.

ing from various psychiatric conditions and had not been represented by counsel during the grievance hearing. These conditions, McLaughlin alleged, had left him unable to respond to the request for admissions of fact, which Judge Dugan had relied upon in rendering his opinion.

Oral argument before this Court occurred on October 31, 2002, after which we filed a per curiam order, disbarring respondent forthwith on November 1, 2002.[13] The order stated:

> For reasons to be stated in an opinion later to be filed, it is this 1st day November, 2002,
>
> ORDERED, by the Court of Appeals of Maryland, that Thomas J. McLaughlin, be, and is hereby, disbarred, effective immediately, from the further practice of law in the State of Maryland; and it is further,
>
> ORDERED that the clerk of this Court shall strike the name of Thomas J. McLaughlin form the register of attorneys, and pursuant to Maryland Rule 16–713, shall certify that fact to the Trustees of the Client Protection Fund and the clerks of all judicial tribunals in the State; and it is further,
>
> ORDERED that respondent shall pay all costs as taxed by the clerk of this Court, including the costs of all transcripts, pursuant to Maryland Rule 16–715(c), for which sum judgment is entered in favor of the Attorney Grievance Commission of Maryland against Thomas J. McLaughlin.

Accordingly, we now state the reasons for our previously issued order.

## I. Standard of Review

■■■■ As the court of original and complete jurisdiction for attorney disciplinary proceedings in Maryland, we conduct an independent review of the record. *Attorney Grievance Comm'n v. Garfield,* 369 Md. 85, 97, 797 A.2d 757, 763 (2002) (citing *Attorney Grievance Comm'n v. Snyder,* 368 Md. 242,

---

13. During oral argument, counsel for McLaughlin stated that McLaughlin had been enjoined from the practice of law on June 10, 2002.

253, 793 A.2d 515, 521 (2002) (citing *Attorney Grievance Comm'n v. Garland*, 345 Md. 383, 392, 692 A.2d 465, 469 (1997))). The hearing judge's findings of fact will be accepted unless we determine that they are clearly erroneous. *Garfield*, 369 Md. at 97, 797 A.2d at 764.

▮ We recently iterated in *Attorney Grievance Comm'n v. Dunietz* that, "[a]s to the hearing judge's conclusions of law, 'our consideration is essentially *de novo*.'" 368 Md. 419, 428, 795 A.2d 706, 710–711 (2002) (quoting *Attorney Grievance Comm'n v. Thompson*, 367 Md. 315, 322, 786 A.2d 763, 768 (2001) (quoting *Attorney Grievance Comm'n v. Briscoe*, 357 Md. 554, 562, 745 A.2d 1037, 1041 (2000)))).

## II. Discussion

### A. Respondent's Proposed Exceptions.

▮ Respondent has alleged that he was denied a fair hearing because he had to represent himself on March 5, 2002, after his counsel withdrew their appearance on January 23, 2002. According to McLaughlin, any problems that resulted from his self-representation and his failure to respond to the requests for admissions of fact should be excused because he lacked litigation skills and suffered from a psychiatric condition. McLaughlin, however, fails to take responsibility for the countless times that the hearing judge, to no avail, gave him opportunities to seek legal counsel, raise objections, and respond to the requests for admissions of fact.[14] Gratuitously, the hearing judge had even gone so far as to afford McLaughlin a post-hearing continuance to respond by April 15, 2002. During that post-hearing hiatus between March 5 and April 22, 2002,[15] McLaughlin did not file any response to the re-

14. Bar Counsel propounded upon respondent a request for admission of fact on December 13, 2001. Under Md. Rule 2–424(b), respondent had thirty days within which to respond to the request. Md. Rule 2–424(b) (2001). Consequently, under Md. Rule 2–24(b), the facts were to be deemed admitted on January 13, 2002.

15. As of April 22, 2002, the date on which the hearing judge prepared his opinion, McLaughlin had not filed any responses. That opinion was filed on April 30, 2002.

quests for admission of fact, even though he had been afforded the additional time to do so. Respondent now requests a remand for an entirely new hearing to attempt to prove that he, in fact, earned all of the money that he was paid by the complainants. The hearing judge found and this Court agrees, as we shall discuss, that McLaughlin charged fees in excess of $72,000 for work he had not done. Thus, a remand is not appropriate. Having been given a fair opportunity to be heard on the request for admissions of fact, McLaughlin has exhausted his entitlement to further judicial proceedings. *See Attorney Grievance Comm'n v. Harris,* 366 Md. 376, 391, 784 A.2d 516, 525 (2001) (citing *Attorney Grievance Comm'n v. Stewart,* 285 Md. 251, 259, 401 A.2d 1026, 1030 (1979) (recognizing that, if a lawyer is given notice and the opportunity to defend in a full and fair hearing, the question of whether he was accorded due process of law is ordinarily immaterial)).

## B. Respondent's Scheme of Design and Implementation Fees

For an appreciation of what McLaughlin offered to his clients who wanted to qualify for Medicaid nursing care benefits, it is necessary to understand the requirements that an applicant must satisfy to be eligible for such benefits. Judge Eldridge for the Court, in *Jackson v. Millstone,* 369 Md. 575, 580–82, 801 A.2d 1034, 1036–38 (2002) (footnotes omitted), described the framework of Maryland's medical assistance plan:

> Congress enacted the Medicaid Act in 1965 as Title XIX of the Social Security Act. *See* 42 U.S.C. § 1396 *et seq.;* 42 C.F.R. §§ 430–456. The Act was designed to enable states, as far as practicable, to furnish medical assistance to individuals whose income and resources are insufficient to meet the costs of necessary medical services. To that end, the Act established a medical assistance program, which is a jointly funded collaboration between the states and the federal government. It is a voluntary program, in which a state may elect, but is not compelled, to participate. When a state elects to participate in the medicaid program, it

prepares and submits for approval by the federal Health Care Financing Administration, the federal agency that administers the Federal Medical Assistance Program, a state medicaid plan for the provision of medical assistance that complies with the federal Medicaid Act and with the regulations promulgated by the Secretary of the Department of Health and Human Services. *See* 42 U.S.C. § 1396a (a); 42 C.F.R. §§§ 430–456. If the federal agency approves the state plan, then the state qualifies for federal funding, whereby the federal government will reimburse the state up to 50% of the cost of the medicaid program. *See,* 42 U.S.C. § 1396b(a); 42 U.S.C. § 1396d(b).

\* \* \*

While the federal government establishes broad policy, secures state compliance with the statute, and dispenses federal funds to supplement state spending on medicaid, there exists some latitude for each state to determine which of its citizens qualify for this form of medical insurance and which services its program will provide. The state agency charged with dispensing the state medicaid program is responsible for interpreting, administering, and complying with federal medicaid statutes and regulations. Within broad federal rules, each state decides eligibility groups, types and range of services, payment levels for services, and administrative and operating procedures.

Maryland has chosen to participate in the medicaid program. It does so through the Maryland Medical Assistance Program, operated by the Department of Health and Mental Hygiene. *See* Maryland Code (1982, 2000 Repl.Vol., 2001 Supp.) § 15–103 of the Health General Article. The program's director, or a designee, is responsible for the approval or denial of applications for preauthorization for payment. Preauthorization, or approval from the Department, is required before one can receive medical assistance benefits. *See* COMAR 10.09.06.01B(30).

Although the federal Medicaid Act only mandates that states provide medical assistance for those classified as

"categorically needy," Maryland's state plan is designed to provide comprehensive health care services for "categorically needy" and "medically needy" persons. *See* §§ 15–201.1, 15–103 of the Health General Article; COMAR 10.09.06.01B(21). *See also* 42 U.S.C. § 1396a(a)(10)(A), (C) (listing those who qualify as "categorically" and "medically" needy, respectively). Under the Maryland Medicaid Plan, "categorically needy" includes "aged, blind, or disabled persons, or families and children, who are otherwise eligible for Medical Assistance and who meet the financial eligibility requirements for FIP, SSI, or Optional State Supplement." COMAR 10.09.24.02B(11). Essentially, "categorically needy" persons are those whose income levels are so low that they qualify to receive cash assistance from an approved state program, and they cannot afford to pay for basic needs or medical assistance. The "medically needy," on the other hand, are "persons who are otherwise eligible for Medical Assistance, who are not categorically needy, and whose income and resources are within the limits set under the [s]tate [p]lan." COMAR 10.09.24.02B(38). *See Jaffe v. Sharp,* 463 F.Supp. 222 (D.Mass.1978) (defining the "medically needy" as individuals and families whose income exceeds that of categorically needy but is nevertheless insufficient to cover medical care).

As Judge Eldridge pointed out, an applicant seeking "medically needy" status must meet certain financial criteria, the satisfaction of which depends on the applicant's income, and resources. *See* COMAR 10.09.24.07 (setting out the income considerations); COMAR 10.09.24.08 (setting out the resource considerations). To be eligible, an applicant's available income must be less than the cost of his or her care. COMAR 10.09.24.07. In addition, an individual applicant will not qualify for benefits if he or she owns more than $2,500 worth of available assets. COMAR 10.09.24.08M. Eligibility is denied if an applicant, to reach the resource standard, made certain non-exempt transfers of his or her assets within the 36 months preceding the application. COMAR 10.09.24.08–1B(2). Examples of exempt transfers include transfers of assets to a

spouse for the sole benefit of the spouse, transfers to the applicant's disabled children or to other disabled individuals under the age of 65, and transfers, without consideration, of a house to certain qualified individuals. COMAR 10.09.24.08–1B(8). If an applicant made a non-exempt transfer within the 36 months preceding his application, the state then penalizes the transfer by assessing penalties of ineligibility. COMAR 10.09.24.08–1B(5)–(6).

In the case before us, respondent offered his clients, generally elderly nursing home applicants and/or their caretakers, the "opportunity" to secure an asset protection plan designed by him. The purpose of the plan, ostensibly, was to manage the clients' assets so that they might qualify for Medicaid benefits without being penalized for improperly transferring their assets. McLaughlin had his clients sign a fee agreement, which called for the client to pay a "design engagement fee" initially and, thereafter, an "implementation engagement fee" to carry out the terms of the plan. All fees under the agreement were "earned when paid and [were] deposited into the firm's operating account." McLaughlin charged a design engagement fee to each of his four clients whose complaints initiated this case. The Perkins were charged $9,000, Glennys Wise was charged $6,000, and Roland Burker and Arlene Glomp individually were charged $10,000.

The so-called "implementation engagement fee" was a "contingent, sliding scale based on a set percentage of the projected savings," namely 25% of savings with a maximum of $40,000. According to the terms of the fee agreement, the projected savings was computed by considering some or all of the following sources:

a. Transfers/Gifts made. If a specific past transfer is not included it must be specified here.

b. Protected spending, including but not limited to: funeral payments, care contracts, attorney's fees, house improvements, car purchases, etc.

   c.   Although Attorney's fees are a protected expense, they are not considered a savings for purposes of calculating the fee.

   d.   Net savings on sale of the house. Includes Capital Gains savings, etc.

   e.   The Spousal Impoverishment amount.

   f.   Future earnings on amounts transferred that would have not been available otherwise.

   g.   Increased savings in monthly income that would have not been available otherwise.

   h.   Value of death value in protected Life Insurance Policies.[16]

McLaughlin's fees also included an administrative appeal engagement fee, which was based on 30% of projected savings, in addition to all other fees and costs of any appeal.

If the applicant was unable to qualify for Medicaid, McLaughlin provided various alternative remedies:

   G.   *Return of Fee if unable to qualify for Medicaid:*

      1.   *Full return of fee*–If the client is unable to qualify for Medicaid, during this period of representation, for a reason caused by the attorney's advice, the client receives a full return.

      2.   *No return of fee*–If the client is unable to qualify for Medicaid, during this period of representation, for a reason unrelated to the attorney's advice, there is no return of fee.

      3.   *Burden of Proof*–If there is a question as to whether the ineligibility results in 1) a full return of 2) no return, the Attorney must demonstrate this to the Client's satisfaction.

---

**16.** The factors for computing the potential savings differed slightly among the four complainants. Several of the fee agreements did not provide for items (c) and (h) above as factors in computing the client's potential savings.

H. *Death of Institutionalized Client*–If a client passes away within one year of the date of this instrument, then the surviving spouse will be eligible for a partial refund up to a maximum of 40% of the fee.

I. *Return Policy–Full Return*–In some instances, the return is full, 100% of the fee. Where a minimum fee is in the agreement, the attorney has the right to retain the minimum fee when the rest of the fee is returned.

J. *Return Policy–Partial Return*–In some instances, a partial fee is returned. Where a minimum fee is in the agreement, the attorney has the right to retain the minimum fee when the rest of the fee is returned.

In each of the fee agreements, McLaughlin included an additional provision governing the timing of the return of any money to the client:

K. *Timing of Return*–Where any fee is to be returned, the attorney has the option of returning the funds within 30 days with no interest OR returning the funds within a longer period of time at 10%/Yr. interest. Both periods of time run from the date on which the attorney is notified of the triggering event.

When McLaughlin failed to perform any services under all of the fee agreements in this case, the clients were forced to accept respondent's chosen option for repayment. With the Perkinses and Burkers, he chose to repay the unearned fees over a period greater than thirty days, thereby, creating a lending arrangement with these clients, in which he was a borrower and the clients were unsuspecting lenders. His activities in this regard, his failure to respond to his clients' requests, his failure to provide services in return for the fees he received, and his improper handling of his clients' fee payments constituted violations of numerous Rules of Professional Conduct as well as several statutes governing attorney conduct. We explain.

**1. Respondent's Violation of MRPC 1.4**

Under MRPC 1.4(a), "[a] lawyer shall keep a client reasonably informed about the status of a matter and prompt-

ly comply with reasonable requests for information." The hearing judge found, based on the admissions of fact, that McLaughlin's behavior with respect to the Perkins and Glomp families constituted a violation of these provisions. We agree.

Scott Perkins, on behalf of his debilitated parents, Toney and Loretta Perkins, initiated contact with respondent, after which his parents entered into a fee agreement with respondent on November 23, 1998. Toney Perkins then paid $5,000 as a design fee on December 22, 1998 and, the day after, passed away. During February of 1999, Scott Perkins paid an additional $35,000 as the balance due under the agreement for a total of $40,000. Between the time of this additional payment and October 18, 1999, Scott Perkins, on behalf of his mother, attempted to communicate with McLaughlin. Scott Perkins wanted to discuss McLaughlin's representation and the return of the $40,000 fee because Mrs. Perkins refused to enter a nursing home. Finally, by October of 1999, McLaughlin agreed to return the fee at the rate of $750 per month until the $40,000 unearned fee was repaid with a 10% yearly interest. McLaughlin completely reneged on this promise, thereby converting the money.

During August of 1999, McLaughlin met with Arlene Glomp and her brothers to discuss an asset protection plan for their mother. After a subsequent meeting with the Glomp family, McLaughlin received $10,000 as a design fee for an asset protection plan. Within one month, McLaughlin met with Mrs. Glomp on four different occasions but failed to communicate about the asset protection plan after October of 1999, despite Mrs. Glomp's efforts to contact him. Because no asset protection plan had materialized by the time the Glomps' mother died on December 21, 1999, Mrs. Glomp requested that McLaughlin refund the design fee. Rather than returning the fee, Mclaughlin attempted to collect from the Glomps a $16,000 implementation fee. Subsequently, the Glomps have made numerous requests for a refund and for information about McLaughlin's promised services, but respondent failed to respond.

The requirements under MRPC 1.4(a) are designed to prevent the exact behavior that respondent exhibited with regard to the Perkinses and Glomps. Respondent's utter failure to communicate with those families or respond to their requests, while he held $50,000 of their money for services he did not perform, does not comport with his professional duty to keep his clients "reasonably informed about the status of a matter" and "promptly comply with reasonable requests for information." MRPC 1.4(a) We conclude, as the hearing judge did, that McLaughlin violated MRPC 1.4(a).

## 2. Respondent's Violation of MRPC 1.5(a) and MRPC 8.4(c)

■ With respect to MRPC 1.5(a) and MRPC 8.4(c), the hearing judge determined that McLaughlin had charged an "exorbitantly excessive" fee in each of the Perkins, Glomp, Wise, and Burker matters.

The Court determines whether an attorney's fee is reasonable, as required by MRPC 1.5(a), by considering the following factors:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.

MRPC 1.5(a); *Attorney Grievance Comm'n v. Monfried,* 368 Md. 373, 390–92, 794 A.2d 92, 102 (2002).

The Perkins family paid McLaughlin a total of $40,000 and never received any plans. The Glomps paid a total of $10,000 and received nothing in return. Glennys Wise, who represent-

ed the interests of both her mother, Irene Ellsworth, and her aunt, Edna Terhall, in qualifying for medical assistance, paid $12,000 as a fee to McLaughlin, who failed to perform any services of appreciable value for the three women. Mrs. Ellsworth died on March 12, 1999, and none of the unearned fee was returned to Ms. Wise, notwithstanding her request.

During October and November of 1999, Roland Burker and his wife met with respondent. Their discussions culminated, on November 8, 1999, with the execution of an agreement, under which the Burkers were to pay $10,000 as a design fee. Although Mr. Burker did not pay the fee in McLaughlin's office, he was met at his home by McLaughlin's personal assistant who had been sent to pick up a cashier's check. After learning that McLaughlin immediately had negotiated the check, Burker decided to terminate the agreement with McLaughlin. Burker also asked for a complete refund of the $10,000 design fee, for which McLaughlin had provided no services. On December 6, 1999, McLaughlin exercised the option under the agreement to return the $10,000 at a rate of $400 monthly plus interest. As an initial payment, respondent gave Mr. Burker a check for $500 but subsequently failed to make any other payments.

In sum, McLaughlin received a total of $72,000 from the four clients. In determining the reasonableness of that amount, we need not consider the factors under MRPC 1.5(a). Because little or no work was performed in exchange for that fee, we deem McLaughlin's fees in the cases before us to be unreasonable *per se*. *Monfried*, 368 Md. at 393, 794 A.2d at 103 ("A fee charged for which little or no work was performed is an unreasonable fee."). None of the four client families received any asset protection plans; in fact, they received nothing of value. Accordingly, we agree with the hearing judge that the fees charged were exorbitantly excessive and constituted a violation of 1.5(a).

The receipt of these excessive fees also violated Rule 8.4(c), prohibiting a lawyer from engaging in conduct involving "dishonesty, fraud, deceit or misrepresentation." The reten-

tion of unearned fees paid by a client, alone, may constitute a violation of Rule 8.4(c). *See Attorney Grievance Comm'n v. Santos*, 370 Md. 77, 87–88, 803 A.2d 505, 511 (2002) (citing *Attorney Grievance Comm'n v. Hayes*, 367 Md. 504, 512–13, 789 A.2d 119, 124 (2002)). The hearing judge in this case quite appropriately characterized what McLaughlin did as "dishonesty, fraud, deceit or misrepresentation" in violation of Rule 8.4(c), because McLaughlin received and retained $72,000 for work that he knew he had not done and "clearly did not plan to do."

### 3. Respondent's Violation of MRPC 1.15 and Maryland Code, Sections 10–304 and 10–306 of the Business Occupations and Professions Article.

In his conclusions of law, the hearing judge determined that McLaughlin did not maintain his client trust accounts in accordance with MRPC 1.15 and Maryland Code, Sections 10–304 and 10–306 of the Business Occupations and Professions Article. MRPC 1.15(a) provides:

> A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

Section 10–304 of the Business Occupations and Professions Article provides:

> (a) *General requirement.*-Except as provided in subsection (b) of this section, a lawyer expeditiously shall deposit trust money into an attorney trust account.

> (b) *Exceptions—Direction of court.*-Subsection (a) of this section does not apply if there is a court order to the contrary.

(c) *Same—Real estate transaction.*-Notwithstanding subsection (a) of this section or any other law, a lawyer may disburse, at settlement in a real estate transaction, trust money that the lawyer receives in the transaction.

Section 10–306 of the Business Occupations and Professions Article provides:

A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer.

■ Under the terms of respondent's fee agreement, the fees he received, whether "design," "implementation," or "appellate," were to be deposited into his operating account rather than into a trust or escrow account. When McLaughlin received the fees from the four clients in this case, he either deposited the fees into his operating account or expended them for his personal use. That money, though, had not been earned. Rather, the clients had paid the fees as a retainer, an advance to McLaughlin in anticipation of his future services. Thus, the money qualified as "trust money" under Section 10–301 of the Business Occupations and Professions Article. *See* Maryland Code, § 10–301(d) of the Business Occupations and Professions Article (defining "trust money" as "a deposit, payment, or other money that a person entrusts to a lawyer to hold for the benefit of a client or a beneficial owner"). The unearned fees should have been deposited into an attorney trust account and maintained separate from McLaughlin's personal account. MRPC 1.15(a); Maryland Code, § 10–304 of the Business Occupations and Professions Article. McLaughlin, nevertheless, either deposited the fees into his operating account or spent the fees for his personal benefit, violating the express provisions of MRPC 1.15(a) and Section 10–304 of the Business Occupations and Professions Article.

■ Not only did McLaughlin deposit the unearned fees improperly, but he also, as the hearing judge stated, "dug the hole even deeper by exhausting the fees ... [for] his own personal and professional purposes." As we stated above, Section 10–306 of the Business Occupations and Professions

Article prohibits an attorney from using "trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer." McLaughlin accepted $72,000 of unearned fees from the families in this case. The families paid those fees expecting, in return, some type of legal services, which McLaughlin never provided. The hearing judge correctly characterized respondent's behavior—taking money without providing services—as a misappropriation of funds, the "gravest form of professional misconduct." *Attorney Grievance Comm'n v. Pattison,* 292 Md. 599, 609, 441 A.2d 328, 333 (1982)(quoting *Bar Ass'n* v. *Marshall,* 269 Md. 510, 307 A.2d 677 (1973).) Such conduct, as we recently discussed in *Attorney Grievance Comm'n v. Gallagher,* 371 Md. 673, 810 A.2d. 996 (2002), clearly violates Section 10–306 of the Business Occupations and Professions Article.

### 4. Respondent's Violation of MRPC 1.7 and MRPC 1.8

The hearing judge found, and we agree, that McLaughlin entered into a prohibited business transaction with his clients by accepting their fees under terms that allowed McLaughlin to return them within thirty days or over a longer period with ten percent annual interest. Specifically, McLaughlin violated MRPC 1.7 and MRPC 1.8, which govern conflicts of interest in an attorney's representation of a client. MRPC 1.7 states, in relevant part: "A lawyer shall not represent a client if the representation of that client may be materially limited by . . . the lawyer's own interests, unless: (1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after consultation." MRPC 1.8 provides that "[a] lawyer shall not enter into a business, financial or property transaction with a client unless: (1) the transaction is fair and equitable to the client; and (2) the client is advised to seek the advice of independent counsel in the transaction and is given a reasonable opportunity to do so."

McLaughlin's violation of these rules rests on the terms of respondent's fee agreement, under which McLaughlin could select from one of two options for returning unearned fees to

the client families. One option allowed McLaughlin to return unearned fees within thirty days with no interest. Under the second option, he could dictate a period of time for repayment at a ten percent rate of interest yearly. When McLaughlin exercised the second option, as he did with the Perkinses and Burkers, he created a loan relationship between him and his clients.

During oral argument in this case, respondent refused to characterize this repayment option over a period of time as a "loan" or a "gift." This Court, however, has no trouble characterizing the second repayment option as a business transaction. McLaughlin had an obligation, therefore, to advise the clients to "seek the advice of independent counsel in the transaction." Despite this clear duty under the rule, McLaughlin neither advised the clients in this case to seek outside counsel nor gave them an opportunity to do so.

Furthermore, as the hearing judge recognized in his conclusions of law, "it is ... debatable whether such [an agreement] is fair and equitable to each of the clients." As we recently stated in *Attorney Grievance Comm'n v. Snyder*:

> to sustain a transaction of advantage to himself with his client, the attorney has the burden of showing, not only that he used no undue influence, but that he gave his client all the information and advice which it would have been his duty to give if he himself had not been interested, and that the transaction was as beneficial to the client as it would have been had the client dealt with a stranger.

368 Md. 242, 265–66, 793 A.2d 515, 529 (2002) (quoting, *Attorney Grievance Comm'n v. Korotki*, 318 Md. 646, 666, 569 A.2d 1224, 1234 (1990) (citation omitted)). Had McLaughlin's clients understood that the fee agreement with respondent provided, in effect, a loan to him, it is questionable whether they would have as readily agreed to the terms, especially given that McLaughlin solely dictated the timing of the fee refund. Without the assistance of outside counsel to explain the consequences of the "business transaction," the clients

were clearly disadvantaged. McLaughlin's self-interest and self-dealing violated both MRPC 1.7 and MRPC 1.8.

**5. Respondent's Violation of MRPC 1.16(d)**

The hearing judge further concluded that McLaughlin violated MRPC 1.16(d) by failing to return his unearned fees upon the termination of his representation. MRPC 1.16(d) provides that "[u]pon the termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect the client's interests, such as . . . surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned." All four of McLaughlin's clients paid fees to him during the course of his "representation." McLaughlin, however, never performed any services for those clients, so he had not earned any fees. Under MRPC 1.16(d), McLaughlin had a duty to return the entirety of unearned fees to the client families. His failure to return the unearned fees, as the hearing judge correctly determined, constituted a violation of MRPC 1.16(d).

**6. Respondent's Violations With Respect to Mariner Health.**

Regarding the final set of allegations against respondent, the hearing judge found that McLaughlin violated Maryland Code, Section 19–346(n) of the Health General Article and MRPC 8.4(d), in addition to other provisions of the Maryland Rules and the Maryland Code discussed above. Section 19–346 of the Health General Article, entitled Property of residents, governs the administration of the property of residents of health care facilities. Section 19–346(n) provides in relevant part:

A person, including the legal representative of the resident, may not use the assets or income of a resident for any purpose that is not authorized by the resident, a designee or legal representative, including a representative payee of the resident.

McLaughlin's violation of Section 19–346(n) arose from McLaughlin's arrangement with Transport Life—Conseco, his

mother's health insurance company. McLaughlin, as his mother's agent, had arranged for Transport Life—Conseco to remit payments for his mother's health care directly to him. He, in turn, was to make the payments for his mother's health care to her care giver, Mariner Health. Under this arrangement, McLaughlin accepted approximately $28,000 but did not use the money to pay Mariner Health. These payments that McLaughlin accepted on behalf of his mother were authorized to be applied only to the cost of his mother's health care, but he unlawfully used them for his own personal or professional benefit. His conduct, in this regard, constituted a violation of Section 19–346(n) of the Health General Article.

In his conclusions with respect to the Mariner Health matter, the hearing judge found McLaughlin also violated MRPC 8.4(d), which treats as misconduct any attorney conduct "that is prejudicial to the administration of justice." Once again, we agree. McLaughlin improperly retained funds paid to him for his mother's benefit and knowingly violated the provisions of Section 19–346(n) of the Health General Article. We find that this knowing violation of the statute also amounts to a violation of MRPC 8.4(d).

The hearing judge, in addition, concluded that McLaughlin violated MRPC 1.15(a) for failing to maintain his mother's healthcare funds in a separate fiduciary account. As we discussed above, MRPC 1.15(a) requires attorneys to "hold property of . . . third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property." As his mother's agent with power of attorney, McLaughlin accepted $28,000 from Transport Life—Conseco on behalf of his mother. Instead of placing these funds in a separate fiduciary account, as required by MRPC 1.15(a), McLaughlin used them for his own personal or professional purposes. We find that clear and convincing evidence in the record supports the hearing judge's conclusion that McLaughlin violated MRPC 1.15(a) with respect to the Mariner Health matter. See Advance Fin. Co. v. Trustees of the Clients' Sec. Trust Fund of the Bar of Maryland, 337 Md. 195, 210–11, 652

A.2d 660, 667 (1995) (recognizing that MRPC 1.15 creates a fiduciary relationship between lawyers and a non-client when the lawyer holds funds in trust for the non-client).

■ The hearing judge also found that McLaughlin violated MRPC 8.4(c) by fraudulently retaining funds for his mother's health care. MRPC 8.4(c) provides that "conduct [by a lawyer] involving dishonesty, fraud, deceit or misrepresentation" is professional misconduct. By accepting funds intended for his mother's benefit and using them for his personal or professional purposes, McLaughlin violated MRPC 8.4(c).

■ Finally, the hearing judge found McLaughlin violated Sections 10–304 and 10–306 of the Business Occupations and Professions Article by using funds entrusted to him in a manner other than which they were intended. Under Section 10–304, a lawyer "shall deposit trust money into an attorney trust account." The money McLaughlin accepted from Transport Life—Conseco was paid in trust for his mother's care, but McLaughlin never deposited it into an attorney trust account. Under Section 10–306, "[a] lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer." Transport Life—Conseco entrusted $28,000 to McLaughlin to pay for his mother's healthcare; however, that money paid for McLaughlin's personal or professional well-being. McLaughlin's blatant misuse of the funds paid by Transport Life—Conseco amounts to violations of Sections 10–304 and 10–306 of the Business Occupations and Professions Article.

## C. Sanctions

■ The Attorney Grievance Commission, through Bar Counsel, argued that disbarment was appropriate in this case, while McLaughlin argued that he had been treated unfairly and should be afforded a whole new hearing. We decided to disbar McLaughlin forthwith, which is a very unusual remedy for this Court to exercise. Such an immediate and unequivocal response is, nonetheless, the most appropriate remedy, given McLaughlin's particularly egregious conduct.

Recently, in *Attorney Grievance Comm'n v. Clark,* 363 Md. 169, 183–84, 767 A.2d 865, 873 (2001), we discussed the purposes for and factors to be considered in a case such as this:

> This Court is mindful that the purpose of the sanctions is to protect the public, to deter other lawyers from engaging in violations of the Maryland Rules of Professional Conduct, and to maintain the integrity of the legal profession. See *Attorney Grievance Comm'n of Maryland v. Hess,* 352 Md. 438, 453, 722 A.2d 905, 913 (1999) (*quoting Attorney Grievance Comm'n of Maryland v. Webster,* 348 Md. 662, 678, 705 A.2d 1135, 1143 (1998)). We have stated that "[t]he public is protected when sanctions are imposed that are commensurate with the nature and gravity of the violations and the intent with which they were committed." *Attorney Grievance Comm'n of Maryland v. Awuah,* 346 Md. 420, 435, 697 A.2d 446, 454 (1997). Therefore, the appropriate sanction depends upon the facts and circumstances of each particular case, including consideration of any mitigating factors. *See Attorney Grievance Comm'n of Maryland v. Atkinson,* 357 Md. 646, 656, 745 A.2d 1086, 1092 (2000); *Attorney Grievance Comm'n of Maryland v. Gavin,* 350 Md. 176, 197–98, 711 A.2d 193, 204 (1998).

In the case at bar, we have sustained the hearing judge's findings and conclusions that McLaughlin violated numerous rules of professional conduct, namely MRPC 1.4 (Communication), MRPC 1.5 (Fees), MRPC 1.7 (Conflict of Interest), MRPC 1.8(a) (Conflict of Interest: Prohibited Transactions), MRPC 1.15 (Safekeeping Property), MRPC 1.16(d) (Declining or Terminating Representation), MRPC 8.4(b),(c) & (d) (Misconduct). We also agree with the hearing judge's determination that McLaughlin violated various statutes, specifically Maryland Code, Section 10–304 of the Business Occupations and Professions Article (Deposit of Trust Money), Section 10–306 of the Business Occupations and Professions Article (Misuse of Trust Money), and Section 19–346(n) of the Health–General Article.

The pattern of McLaughlin's misconduct reflects a willful and unmitigated misuse of client funds as well as the funds paid to him in trust for his mother's care.[17] Moreover, we find it especially troubling that McLaughlin's chosen prey in his fraudulent scheme were the elderly and their families, vulnerable people who sought McLaughlin's assistance in alleviating their difficult circumstances. This Court has a responsibility to protect the public from the actions of an attorney that exploits the fragile for personal gain, as did McLaughlin. As we have repeatedly decided, only disbarment provides the necessary shield from conduct so blatantly nefarious. *See Gallagher,* 371 Md. at 715, 810 A.2d. at 1021 ("[R]espondent's numerous violations, his egregious conduct and this Court's consistent practice of disbarment of lawyers who misappropriate client funds absent mitigation or extenuating circumstances, we hold that the appropriate sanction for respondent's conduct is disbarment."). Accordingly, we have disbarred respondent.

---

**17.** This case does not represent the only occasion in which this Court has addressed McLaughlin's professional shortcomings. In 1996, McLaughlin and Bar Counsel filed, in this Court, a Joint Petition for Reprimand by Consent for violations of MRPC 1.4, MRPC 1.3, and MRPC 8.1. *Attorney Grievance Comm'n v. McLaughlin,* 344 Md. 372, 372–73, 686 A.2d 1103 (1996). The Court ordered McLaughlin reprimanded and required his practice to be monitored under the terms of the Joint Petition. *Id.* at 373, 686 A.2d at 1103. That reprimand shows that McLaughlin already has received a warning to correct his unprofessional behavior. Despite the reprimand, McLaughlin continued to disregard the Maryland Rules of Professional Conduct in his practice.