846 A.2d 353

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Gary S. MININSOHN.**

**No. 70, Sept. Term, 2002.**

Court of Appeals of Maryland.

March 17, 2004.

Reconsideration Denied May 6, 2004.

Melvin Hirshman, Bar Counsel, Raymond A. Hein, Asst. Bar Counsel for Atty. Grievance Com'n, for petitioner.

Deane A. Shure, Rockville, for respondent.

Argued before BELL, C.J., WILNER, CATHELL, HARRELL, BATTAGLIA, JOHN C. ELDRIDGE, (retired, specially assigned) and LAWRENCE F. RODOWSKY, (retired, specially assigned), JJ.

BATTAGLIA, J.

The Attorney Grievance Commission of Maryland ("Petitioner" or "Bar Counsel"), acting through Bar Counsel and pursuant to Maryland Rule 16–751(a),[1] filed a petition for disciplinary or remedial action against respondent, Gary S. Mininsohn, Esquire, on October 23, 2002. The Petition alleged that Mininsohn, who was admitted to the Bar of this Court on June 25, 1975, violated several Maryland Rules of Professional Conduct, specifically 1.3 (Diligence),[2] 1.4 (Com-

---

1. Maryland Rule 16–751(a) provides: "Commencement of disciplinary or remedial action. (1) Upon approval of the [Attorney Grievance] Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals."

2. Under Rule 1.3, "[a] lawyer shall act with reasonable diligence and promptness in representing a client."

munication),[3] 1.15 (Safekeeping property),[4] 1.5 (Fees),[5] 3.4 (Fairness to opposing party and counsel),[6] and 8.4 (Misconduct).[7] Violations of Maryland Rule 16–609 (Prohibited trans-

---

**3.** Rule 1.4, in relevant part, states: "(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information."

**4.** Rule 1.15, in relevant part, provides:
(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.
(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

**5.** Rule 1.5, in relevant part, provides:
(c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee agreement is prohibited by paragraph (d) or other law. The terms of a contingent fee agreement shall be communicated to the client in writing. The communication shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and, if there is a recovery, showing the remittance to the client and the method of its determination.

**6.** Rule 3.4, in relevant part, provides: "A lawyer shall not: ... (c) knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists...."

**7.** Under Rule 8.4:
It is professional misconduct for a lawyer to:
(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

actions),[8] Maryland Code, Section 10–306 of the Business Occupations and Professions Article (1989, 2000 Repl.Vol.)("A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer") and Maryland Code (1988, 1997 Repl Vol., 2003 Cum.Supp.), Sections 10–906 and 13–1007 of the Tax–General Article, requiring employers to withhold, report, and remit to the Comptroller employee income taxes, also are alleged.[9] In accordance with Maryland Rules 16–752(a) and 16–757(c),[10] we

---

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; [or]

(d) engage in conduct that is prejudicial to the administration of justice . . . .

**8.** Maryland Rule 16–609 provides:

An attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer.

**9.** Section 10–906 of the Tax–General Article, in relevant part, provides:

(a) *Required.*—Except as provided in § 10–907 of this subtitle, each employer or payor shall:

(1) withhold the income tax required to be withheld under § 10–908 of this subtitle; and

(2) pay to the Comptroller the income tax withheld for a period with the withholding return that covers the period.

(b) *Tax withheld deemed held in trust.*—Any income tax withheld is deemed to be held in trust for the State by the employer or payor who withholds the tax.

(c) *Separate account required.*—An employer or payor who withholds income tax shall keep a separate ledger account for withholdings that indicates clearly:

(1) the amount of income tax withheld; and

(2) that the income tax withheld is the property of the State.

Section 13–1007 of the Tax–General Article provides criminal penalties, *inter alia,* for willful failure to file required income tax withholding returns (subsection (a)), willful failure to withhold the tax as required (subsection (b)), and willful failure to remit withheld tax to the Comptroller (subsection (c)).

**10.** Maryland Rule 16–752(a) states:

Upon the filing of a Petition for Disciplinary or Remedial Action, the Court of Appeals may enter an order designating a judge of any circuit court to hear the action and the clerk responsible for maintaining the record. The order of designation shall require the judge, after consultation with Bar Counsel and the attorney, to enter a

referred the petition to Judge John H. Tisdale of the Circuit Court for Frederick County for an evidentiary hearing and to make findings of fact and conclusions of law.

On March 8 and 9, 2003 and May 28, 2003, Judge Tisdale held hearings and on July 11, 2003, issued a Report and Recommendations in which he found, by clear and convincing evidence, that Mininsohn violated Rules 1.3, 1.5(c), 1.15(a) and (b), 3.4(c), 8.4(a) and (d), Maryland Rule 16–109, Business Occupations and Professions Article, Section 10–306, Tax–General Article, Section 10–906(a), (b), and (c), and Tax–General Article, Section 13–1007(b) and (c). Bar Counsel filed exceptions to the hearing judge's failure to find violations of Rules 8.4(b) and (c). Mininsohn filed several exceptions, stating that he did not violate Rule 3.4(c) when he failed to appear in court because of an ice storm and notified the court clerk to that effect, that he did not violate Rule 1.3 because he mistakenly believed that opposing counsel intended to prepare an Order at the direction of the court instead of him, that he did not violate Rule 1.15(b) because he had resolved all outstanding payments he had been required to make on a client's behalf, and that he did not willfully fail to withhold and pay income tax because the attorney he had hired handled his tax obligations incorrectly. We sustain Bar Counsel's exceptions and additionally find violations of Rules 8.4(b) and 8.4(c). We overrule Mininsohn's exceptions. The appropriate sanction is disbarment.

Judge Tisdale's Findings of Fact and Conclusions of Law follow:

### Findings of Fact

"This action arises out of four separate complaints made to the Commission regarding the conduct of the Respondent.

---

scheduling order defining the extent of discovery and setting dates for the completion of discovery, filing of motions, and hearing.

Maryland Rule 16–757(c) states in pertinent part: "The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law. . . ."

The underlying facts were not highly contested. Based on the testimony, documentary and other evidence, in accordance with the burdens of proof set forth in Rule 16–757(b), this court makes the following findings of fact:

"Gary S. Mininsohn was admitted to the Bar of the Court of Appeals of Maryland on June 25, 1975. Since approximately 1978, Respondent has continuously maintained a law office in Rockville, Maryland, primarily practicing as a sole practitioner.

## B.C. Docket No. 2001–145–16–8

### Reuschling Complaint

"In November 1998, Respondent engaged the services of Glen F. Reuschling ('Reuschling'), an accident reconstruction expert. Respondent hired Reuschling to assist and to testify in connection with Respondent's representation of a client, Norma Chicas ('Chicas'), in a vehicular negligence case in Montgomery County. After the trial at which he testified, Reuschling presented Respondent with a bill for his services for $2,557.80. Respondent's client made an initial payment to Reuschling.

"Reuschling testified that he made several demands for payment from Respondent, who informed him that he would have to file suit to collect because he did not intend to pay. Respondent testified that Reuschling's services were unsatisfactory and contributed to a ruling against his client. Respondent instructed Reuschling to proceed against his client to collect and assumed that Reuschling reached an agreement with the client.

"On April 6, 1999, Reuschling, represented by Mervyn A. Schwedt, Esquire ('Schwedt'), filed suit against Respondent in the District Court of Maryland for Montgomery County, seeking damages in the outstanding amount billed by Reuschling for his services in the Chicas case. After service of the civil complaint filed by Reuschling, Respondent did not file a Notice of Intention to Defend or otherwise

respond to the complaint. Respondent also did not appear for trial on July 7, 1999.

"The District Court entered a default judgment against Respondent for $2,557.80, plus attorney's fees and costs. Respondent did not file any motion for post-judgment relief, nor did he note an appeal from the judgment entered.

"Schwedt testified that in August 1999, he sent Respondent Interrogatories in Aid of Enforcement of Judgment by first class mail and fax. Schwedt's testimony is confirmed by his filing of a Notice of Service of Discovery Materials on August 27, 1999. Respondent failed to respond to the interrogatories.

"On June 5, 2000, Schwedt initiated further Post-judgment proceedings by filing separate requests for a Writ of Garnishment of Property Other Than Wages and for a Writ of Garnishment on Wages, both directed to 'Mininsohn & Associates,' the trade name used by Respondent in his law practice and to Respondent himself. On the same date, Schwedt again requested an Order Directing Defendant to Appear for Examination in Aid of Enforcement of Judgment (Oral).

"The District Court issued the two writs for service on Respondent's law practice and a subpoena requiring Respondent to appear in person on August 23, 2000 'to be examined under oath concerning any assets, property or credits' and ordering Respondent to bring with him records set forth in the request filed by plaintiff's counsel.

"On June 29, 2000, a private process server engaged by Schwedt personally served Respondent with the writs and the order directing Respondent to appear for oral examination. While Respondent stipulated that the service of the writs and the order was proper, he claims not to have distinct recollection of service. Respondent does acknowledge that he was in court on another matter around this time and may have been handed a piece of paper that constituted the writ and order. Respondent believes that he misplaced the writ and the order in a file.

"Respondent failed to answer either writ or to file a motion asserting a defense or an objection. Respondent failed to appear in court on August 23, 2000. Respondent did not ask for a continuance from the court nor did he inform the court that he would not be available on that date. On or after August 23, 2000, Respondent received a phone call from Schwedt asking him why he was not in court.

"Upon his failure to appear, the District Court issued a Show Cause Order for Contempt directing Respondent to appear personally in court on November 15, 2000. Respondent was personally served with the Show Cause Order on October 6, 2000. Respondent appeared in court on November 15, 2000, but did not bring with him any records responsive to the requests made in conjunction with the previously issued order that he appear for oral examination. The matter was continued until December 20, 2000. Respondent acknowledged the continuance by signing a document provided by the court.

"On December 20, 2000, Respondent again failed to appear in court, although Reuschling and Schwedt were present. Respondent alleges he was unable to appear in court due to inclement weather and that he did call the court to advise that he would not be present. As a result of his failure to appear a body attachment was requested. Although Respondent testified in this proceeding that he called and left a message with the clerk's office, there is no mention of a call to the court in the written motion to rescind body attachment that Respondent filed on January 5, 2001.

"On January 11, 2001, a directive was issued to set the case as a Show Cause for Contempt hearing before Judge Cornelius J. Vaughey, Administrative Judge for District 6 of the District Court of Maryland. On January 24, 2001, the District Court held a hearing on the pending contempt and body attachment. On that date, Respondent appeared in court, as did Reuschling and Schwedt, now making their fourth court appearance. Judge Vaughey ordered Respondent to produce the requested records on or before March 12, 2001, and identified the documents to be produced on a

list numbered one through 22 in his own handwriting. Judge Vaughey also wrote 'failure to produce said documents may cause the defendant [Mininsohn] to be held in contempt of this court.' Judge Vaughey re-set the case for a status hearing on March 21, 2001, 'if the documents are not satisfactorily produced.' A copy of Judge Vaughey's handwritten list and comments was provided to Respondent on January 24, 2001.

"Respondent did not provide Schwedt with any documents from the list prepared by Judge Vaughey, nor did he communicate any explanation for his failure to respond. On March 21, 2001, at the status hearing before Judge Vaughey, Respondent informed the court that he (Respondent) had filed a petition for bankruptcy earlier that day. Due to the bankruptcy filing, an automatic stay of the proceedings in the District Court of Maryland was entered.

"The bankruptcy court denied Respondent a discharge of his debt to Reuschling, i.e., the money judgment entered July 7, 1999 by the District Court of Maryland. The post-judgment proceedings in the District Court of Maryland thereafter were reopened upon Reuschling's request.

"When this disciplinary matter was initially before this court for a hearing on April 8 and 9, 2003, the judgment entered against Respondent remained unsatisfied. When the parties returned to conclude the hearing on May 28, 2003, Respondent's counsel introduced an order of satisfaction indicating Respondent had satisfied the judgment debt to Reuschling in the interim.

"Respondent admitted that as an officer of the court, he has an obligation to comply with court orders, whether representing a client or acting on his own behalf.

**B.C. Docket No. 2001–215–16–8**

**Leu–Gearhart Complaint**

"In 1992 Respondent began representing Susan Leu (now Gearhart) in a family law matter. The case, *John Leu v. Susan Leu,* Case No. 92–0786–CV, went on for several

years as the parties contested issues of custody, visitation and child support involving a minor child. William R. Nicklas, Jr., Esquire, represented the minor child and Patricia F. O'Connor, Esquire, represented the father, John Leu.

"At a hearing on October 3, 1997, the parties finalized an agreement on the record on various issues, including child support and attorney's fees for Mr. Nicklas. Judge Dwyer instructed Respondent to prepare an order incorporating the terms of the parties' agreement for the court's signature.

"Within a month following the hearing, Respondent evidently forwarded a proposed order to Ms. O'Connor. Ms. O'Connor sent Respondent a letter dated November 4, 1997, acknowledging receipt of the order and requesting one modification but otherwise agreeing to the language. Ms. O'Connor requested that Respondent submit a revised order for her review and signature.

"There is insufficient evidence in the record to determine exactly why the proposed order was not finalized after November 4, 1997, but it is clear that no order was ever filed with the court.

"Respondent admits that he failed to submit a final order. Respondent claims that he was under the mistaken impression that opposing counsel would prepare and submit the order.

"No order was submitted to Judge Dwyer.

**B.C No.2001–200–16–8**

**Rosen Complaint**

"On May 4, 1996, Melanie Rosen ('Rosen') was injured in a motor vehicle accident. On or about February 12, 1997, Rosen retained Respondent to represent her in a suit to recover damages. Rosen and her mother, Linda Rosen, signed a retainer agreement that provided for Respondent to receive a contingency fee of thirty-three percent of any and all monies that were recovered.

"In 1998, suit was filed in the District Court for Prince George's County against State Farm Insurance. Respondent asked James J. Cagley, Esquire ('Cagley'), to handle the trial for him. Cagley had worked for Respondent in the past as an associate but was not employed by Respondent or otherwise associated with Respondent's law practice at that time. Rosen was advised of and agreed to Cagley's participation in the case in advance of trial.

"In July 1999, Cagley represented Rosen at trial. Judgment was entered in favor of Rosen in the amount of $7,274.59, plus court costs. On August 5, 1999, counsel for State Farm forwarded a draft in the amount of $7,324.59 to Cagley. State Farm made the draft payable to Rosen and Respondent. Cagley turned the draft over to Respondent so Respondent could handle disbursement of the proceeds from the case.

"Some time following the receipt of payment from State Farm, Cagley prepared a handwritten list of medical bills and litigation costs related to the case. Thereafter, Cagley prepared a separate handwritten document titled 'Disbursement Sheet (Draft)', breaking down the amounts to be deducted from the Rosen 'award', including counsel fees, litigation expenses and outstanding medical bills and liens. In order to ensure that the client, Melanie Rosen, cleared $2,000.00, Respondent and Cagley agreed to reduce their combined attorney's fee to $2,319.95. Cagley confirmed this in a handwritten note to Respondent dated October 4, 1999.

"On August 20, 1999, Respondent deposited the draft into his attorney trust account at the Suburban Bank of Maryland. Respondent admits that these funds represent trust money as defined by the Maryland Code, Business Occupations & Professions § 10–306(d).

"On October 8, 1999, Respondent issued the following three checks drawn on his attorney trust account:

| Check # | Amount | Payee |
|---------|--------|-------|
| 768 | $1,159.98 | Gary Mininsohn |
| 769 | $2,000.00 | Melanie Rosen |
| 770 | $1,159.97 | James Cagley |
| TOTAL | $4,319.95 | |

"By October 21, 1999, those three checks had posted to Respondent's trust account. At that point, the undisbursed balance (trust money) from the proceeds of the Melanie Rosen case was $3,004.64.

"On November 10, 1999, Respondent issued another check to Cagley in the amount of $61.60 to reimburse him for expenses. Of that check, $51.60 was directly attributable to the Rosen case. Respondent continued to maintain possession and control of the remaining trust money from the Rosen case. After issuing the $61.60 check to Cagley on November 10, 1999, Respondent did not make any further distributions attributable to the Rosen case until June 2000. During that period, three medical bills or liens listed on the draft disbursement sheet prepared by Cagley remained unpaid, as follows:

| | |
|---|---|
| Dr. Michaels | $ 250.00 |
| Germantown Injury Care Center, Inc. | $2,392.09 |
| MAMSI Lien | $ 246.46 |
| TOTAL | $2,888.55 |

"Through June 28, 2000, the balance in Respondent's attorney trust account remained above the undisbursed Rosen trust money balance of $2,953.04. On June 26, 2000, Respondent wrote two checks to himself totaling $1,900.00. One check for $1,000.00 was annotated 'fee transfer' and the other check for $900.00 was a transfer to payroll. The presentment of those two checks on June 28, 2000 caused the balance in the Respondent's trust account to fall to $2,101.68, below the $2,953.04 that should have remained in trust from the Rosen case.

"In June 2000, Respondent reached an agreement with a representative of Germantown Injury Care Center, Inc. to accept $1,554.00 as a compromise of Melanie Rosen's outstanding balance owed for medical treatment. Respondent wrote a trust account check, for $1,554.00 payable to 'Germantown Injury Center' on June 23, 2000.

"After deducting the payment of $1,554.00 to Germantown Injury Care Center, Inc. from the previous Rosen trust

money balance of $2,953.04, Respondent should have been holding $1,399.04 in trust money related to the Rosen case. Instead, the overall balance in Respondent's trust account remained at $547.68 from July 10, 2000 until September 5, 2000, when other client or fiduciary funds, unrelated to the Rosen case, were deposited.

"After obtaining a reduction of the Germantown Injury Care Center, Inc. bill from $2,392.09 to $1,554.00, Respondent did not promptly disburse the amount of the reduction ($838.09) to his client, Melanie Rosen, or to any third party for Rosen's benefit. Further, Respondent still had not disbursed payments to Dr. Michaels and to MAMSI, as had been listed on the disbursement sheet prepared by Cagley.

"In late November 2000, Rosen's mother, Linda Rosen, filed a complaint against Respondent with the Commission. With a cover letter dated December 4, 2000, Bar Counsel forwarded a copy of Linda Rosen's complaint to Respondent and requested a written response. Bar Counsel's letter specifically requested that Respondent 'provide a full accounting of the settlement funds you received on behalf of Melanie Rosen, including copies of a settlement distribution sheet, a deposit ticket reflecting your deposit of the settlement funds and all canceled checks by which funds were disbursed.' Bar counsel's letter further requested copies of Respondent's 'monthly trust account statements from the date the settlement funds were first deposited through the present.' "

"Respondent responded to Bar Counsel in a letter dated January 2, 2001, and received by the Commission on January 16, 2001. Respondent's letter did not provide the complete accounting of the Rosen settlement funds requested by Bar Counsel. With his letter, Respondent submitted copies of only three trust account checks, numbered 786, 788 and 789. The three checks, submitted by Respondent, all dated October 12, 2000, were made payable as follows:

| Check # | Amount | Payee |
|---------|--------|-------|
| 786 | $584.99 | Melanie Rosen |
| 788 | $ 65.00 | Dr. Weiss |
| 789 | $100.00 | U.S. Legal Support |
| TOTAL | $749.99 | |

"Respondent indicated in his letter to Bar Counsel that the check to Melanie Rosen represented 'additional monies' for Rosen linked to a reduction in a medical bill owed to a 'Dr. Bolger' (Germantown Injury Care Center). Respondent did not disclose to Bar Counsel that the reduction had been negotiated in June 2000. Respondent provided no other information in his letter concerning the amount deposited in his trust account as proceeds of Rosen's case or about the distribution of such funds.

"The check to Rosen, purportedly written on October 12, 2000, posted to Respondent's trust account on December 27, 2000. The check to Dr. Weiss, issued in payment of a medical bill incurred by Rosen, also dated October 12, 2000, posted to Respondent's trust account on January 3, 2001. The check to U.S. Legal Support, for a deposition transcript from a second unrelated personal injury case in which Respondent and Cagley also represented Rosen, also dated October 12, 2000, posted to the account on January 9, 2001. There was no recovery in the second case, which went to trial in February 2000. Upon deducting the combined total of those three checks, a balance of $649.05 in trust money should have remained on the Rosen client ledger. Respondent, however, maintained no running ledger balance or other record keeping system that kept track of the trust money in the Rosen case.

"Marc O. Fiedler ('Fiedler'), an investigator employed by the Commission, testified in this proceeding that he was assigned to conduct further investigation of the complaint filed by Linda Rosen. Fiedler testified that he made an appointment to interview Respondent. When he made the appointment, Fiedler asked Respondent to have available all information and documents previously requested in Bar Counsel's letter dated December 4, 2000.

"At the time of the interview, Respondent did not have available and did not provide any deposit item(s), canceled checks or trust account statements. Respondent did provide Fiedler with copies of the three documents prepared by Cagley, including the draft disbursement sheet listing, *inter*

*alia,* the disbursements to be made to Dr. Michaels and to MAMSI. When Fiedler asked Respondent if he had any written statement in his file showing the remittance to Rosen and how it was determined, Respondent was unable to produce any such statement other than the draft disbursement sheet prepared by Cagley.

"At the conclusion of Fiedler's interview of Respondent, Fiedler reiterated Bar Counsel's request that Respondent provide bank statements, deposit items and canceled checks, i.e., records that would enable Bar Counsel to review Respondent's receipt, maintenance and disbursement of trust money in the Rosen case. When Bar Counsel had not received such records by February 28, 2001, Fiedler sent Respondent a letter to that effect. Respondent then forwarded a set of monthly trust account statements without any explanatory cover letter.

"Because the materials that Respondent submitted were insufficient to satisfy Bar Counsel's request, Bar Counsel issued a subpoena to the custodian of records at The Columbia Bank (successor to Suburban Bank of Maryland) to obtain Respondent's complete trust account records dating back to May 1999. The Columbia Bank ultimately produced such records to Bar Counsel.

"Respondent did not disburse payments to Dr. Michaels in the amount of $250.00 and to MAMSI in the amount of $246.46, either from his trust account or from any other account. The only written distribution statement that may have been provided to the client, Melanie Rosen, was the draft disbursement sheet prepared by Cagley. That statement inaccurately reflected the determination of the remittance to Rosen because the remittance was premised, *inter alia,* on the deduction of the amounts listed as payments to be made to Dr. Michaels and to MAMSI.

"The analysis of the Rosen trust money and of other activity in Respondent's trust account is supported by bank records obtained by Bar Counsel for the period from May 7, 1999 through April 30, 2001. In addition, John DeBone, a paralegal employed by the Commission, prepared a transaction

summary and testified in support of his analysis of the bank records.

"Respondent has been unable to locate the Rosen file. Respondent failed to provide a copy of any written statement he may have sent to Rosen explaining the outcome of her case and showing the remittance to Rosen. Respondent explained that he could not recall whether or not Rosen received a written statement incorporating the disbursements in her case from Respondent or if it was sent by Cagley.

"In court, Respondent testified that he continued to hold funds in the Rosen account to pay Dr. Michaels and MAMSI and that he wrote checks as recently as March 31, 2003, but has not sent them. Respondent could not assert that there were sufficient funds in his trust account to cover those checks on the date that he testified. Respondent said he believed that he had funds of his own in the trust account when he drew the two checks in the amount of $1,900.00 and mistakenly transferred clients' funds.

"Respondent testified that he had kept the Rosen account open while he attempted to resolve a claim of the chiropractor by attempting to achieve a reduction in the latter's fee. Further, he says he lost touch with his client, who moved frequently.

## BC Docket No. 2001–237–16–8

### Failure to Pay Withholding Tax

"Since 1995, Respondent has continuously maintained an employer withholding tax account with the State of Maryland, Comptroller of the Treasury ('Comptroller'). That account has been held in the name of Gary S. Mininsohn. In September 1995 and October 1996, tax liens were filed against Respondent for delinquent payment of income tax reported as being withheld from his employees' wages. Those two liens were satisfied in October 1998 through a bank garnishment.

"As an employer, Respondent was responsible for filing periodic reports of income tax withheld from his employees' wages. Those reports, designated by the Comptroller as Form MW–506, are to be filed on either a monthly or quarterly schedule. The employer is required to remit payment of withheld income tax to the Comptroller at the same time such reports are filed.

"Respondent, who was on a monthly reporting schedule, did not file any Forms MW–506 after January 1999. Consequently, the Comptroller began preparing estimates of income tax that should have been withheld from his employees' wages. Respondent did not notify the Comptroller in writing that he no longer had any employees. The Comptroller received year-end W–2 forms for 1999 and 2000 reflecting that Respondent did have employees who received taxable income from Respondent in those years.

"After January 1999, Respondent no longer withheld State income tax from the wages of his employees and therefore did not hold such funds in trust for the State. Respondent likewise made no payments of State income tax that should have been withheld from his employees' wages after January 1999. By providing W–2 forms reporting Maryland income tax withholdings in 1999 and 2000, Respondent misrepresented to his employees and to the State that money had been withheld for payment of taxes when, in fact, such money had not been withheld.

"On November 6, 2000, the Comptroller filed a Notice of Lien of Judgment for Unpaid Tax against Respondent in the Circuit Court for Montgomery County. That lien was for unpaid withholding tax in the amount of $1,899.13, plus interest of $308.23 and penalty of $248.89, for a total lien amount of $2,492.25. That lien covered Respondent's withholding tax liability for 1999.

"On February 25, 2003, the Comptroller filed another cumulative withholding tax lien against Respondent in the Circuit Court for Montgomery County. That lien reflected unpaid tax in the amount of $5,129.16, plus interest of $1,704.58 and penalty of $850.66, for a total lien amount of $7,684.40,

covering the years 1999 through 2001. As of the conclusion of the hearing before this court, Respondent had not satisfied any portion of that lien, nor had he entered into any payment plan with the Comptroller.

"Respondent understood his obligation as an employer to withhold income tax from the salaries of his employees and to report such withholding. Respondent further understood the fiduciary nature of his obligation to the State and federal tax collecting authorities, i.e., that monies withheld by an employer for payment of employees' income tax constitute trust monies.

"Respondent acknowledges that he failed to submit employee withholding returns and payment at times, ascribing his shortcomings to financial problems and neglect of administrative details. Respondent contracted the services of an agency to prepare employee-withholding forms in the year 2000, although he submitted the forms himself. Respondent suggests that the agency was incorrect in filling out the forms and that he did not catch the mistakes before submitting them. Respondent has not notified the Comptroller that he has no employees subject to withholding.

### *Respondent's Case*

"The Respondent testified on his own behalf. Respondent testified that in 1996, a number of events occurred which dramatically affected his ability to cope with his personal and professional responsibilities. In the spring of that year, Respondent received a telephone call informing him that his wife had been named in a domestic proceeding as a paramour of the husband of a couple with whom Respondent and his wife had maintained a close social relationship. Respondent and his wife separated as their children's school year ended in mid-June 1996.

"Respondent's mother died July 4, 1996. Her death was especially difficult for the Respondent, coming close on the heels of the breakup of his marriage. During that same year, an administrative assistant of long standing, upon whom the Respondent relied heavily, left his employ and

moved to Texas. Respondent testified that those three events, which came in such close succession, staggered Respondent.

"Respondent has maintained an active trial practice for most of his professional career. Respondent testified that his personal difficulties, including the loss of his dependable assistant, left him unable to provide adequate supervision to employees he hired.

"Furthermore, Respondent experienced financial problems as he attempted to provide college educations for his two children and cope with debts that remained after his divorce. Respondent's difficulty in focusing on professional matters caused a downturn in his practice, and his acceptance of small retainers from clients severely limited the cash flow in his practice.

"Respondent and his witnesses portrayed an individual who is disorganized in both his personal and professional lives. For example, although Respondent believes he received a copy of the Interrogatories from Reuschling's attorney, Respondent does not actually recall seeing them. Respondent also does not recall receiving the court orders, but Respondent does acknowledge that at some point he was personally handed a copy.

"Respondent called a number of witnesses to attest to his professional integrity and competence. James P. Nolan, President of the Maryland State Bar Association, testified that he and the Respondent were law school classmates and that their respective families had been close socially since the time the two were in law school. Mr. Nolan has called upon Respondent for legal advice and referred cases to him, even recently. Mr. Nolan was aware of the personal problems Respondent encountered and observed that he had seemed to lose focus on the business side of his law practice.

"John Kudel, a former President of the Montgomery County Bar Association and Montgomery County Bar Foundation and member of the Board of Governors of the Maryland State Bar Association, testified that he and the Respondent have shared office space for about five years and during

that time have worked on some cases together. Mr. Kudel was aware of the events that occurred in Respondent's life in 1996 and had observed that thereafter there had been a noticeable turnover in Respondent's employees, apparently resulting from a rather haphazard hiring of unskilled people by the Respondent.

"The office manager of the attorneys who share offices with the Respondent testified that she has known the Respondent for about 18 years. She has observed that, since the events of 1996, Respondent has not attended to details such as timely billing and careful hiring of employees. As a result of the latter, Respondent has had a series of inexperienced employees who did not remain in his employ long enough to be properly trained and become effective employees.

"An employee of Respondent's counsel testified that she has been working for Respondent as an independent contractor since February of this year, acting as a bookkeeper. She has kept track of Respondent's accounts receivable and payable, client billing and bank accounts, including his client trust account.

"William Simmons, Chair of the Montgomery County Lawyer Assistance Program testified that he had received a complaint from Judge Vaughey of the District Court of Maryland for Montgomery County and contacted the Respondent. Simmons has met with the Respondent three or four times to assist the Respondent in organizing his practice.

"The three lawyers who testified for the Respondent all asserted that their experience over the years with the Respondent have led them to conclude that he exhibits a high level of legal competence and integrity.

"Respondent called David R. Eddy, Ph.D., a clinical therapist licensed in Virginia and Maryland, with whom he has been in counseling since January of this year. Dr. Eddy testified that he has worked with Respondent to resolve issues arising from the personal events that occurred in 1996. Dr. Eddy assesses the Respondent as one who

wishes to please everyone and who leads a chaotic personal and professional life. Dr. Eddy believes that the Respondent exhibits numerous features of depression, including general sadness and sleep interruption and is preoccupied with the losses in his life. During counseling sessions, Respondent has acknowledged to Dr. Eddy that he committed many of the acts or omissions that led to the current charges against him by the Attorney Grievance Commission.

"Upon cross-examination, Dr. Eddy testified that Respondent's apparent depression does not affect his ability to recognize his responsibilities, but affects his ability to carry out those responsibilities. Dr. Eddy could not assert a causal connection between Respondent's psychological [condition] and the misconduct alleged in this proceeding.

"While Respondent admitted to most, if not all of the violations, he ascribes their course to his personal difficulties and his difficulty in focusing on details in his law practice.

## CONCLUSIONS OF LAW

"Based upon the findings of fact proven by clear and convincing evidence, this court concludes:

### Reuschling Complaint:

"The evidence clearly establishes that the Respondent failed to appear in the District Court for examination in aid of enforcement of judgment on August 23, 2000. Thereafter, Respondent appeared on November 15, 2000, without the required records he had been ordered to produce. Although Respondent claims that his absence on December 20, 2000 is explained by inclement weather, he took no steps to reschedule the proceeding or to prevent a proceeding being held to determine whether or not he should be found in contempt. When Respondent appeared in court on January 24, 2001, he was ordered by the Judge to produce a number of records on or before March 12, 2001. Respondent did not produce those records. Respondent has not asserted that

he had no valid obligation to respond and to conform to the rules of court.

"In connection with Mr. Reuschling's efforts to enforce a judgment obtained against Respondent, Respondent repeatedly failed to appear in court and to produce documents as directed by court order. Respondent knowingly disobeyed numerous obligations and court orders and is in violation MRPC 3.4(c).

"Failure of an attorney to be present for a scheduled court appearance interferes with the administration of justice. *Attorney Grievance Comm'n v. Ficker*, 319 Md. 305, 315, 572 A.2d 501 (1990). There, the attorney was found in violation of the ethical rule that prohibited engaging in conduct prejudicial to the administration of justice, for missing a court appearance on behalf of a client. In this instance Respondent failed to appear at a proceeding that he personally had been ordered to attend and twice failed to produce records as ordered by the District Court. Respondent engaged in conduct that was prejudicial to the administration of justice in violation of MRPC 8.4(d). Respondent is, by violating 8.4(d), also in violation of Rule 8.4(a).

### *Leu–Gearhart Complaint*

"Respondent was directed by Judge Dwyer to prepare an order incorporating the terms of the parties' agreement at the conclusion of proceedings on October 3, 1997. Respondent was aware of Judge Dwyer's direction as was evidenced by the correspondence between the Respondent and the other attorneys involved in the case. Respondent did not submit the order as directed.

"Respondent violated MRPC 1.3 by not acting with 'reasonable diligence and promptness in representing a client.' By Respondent's lack of diligence and failure to fulfill the directive of the court he has violated Rule 8.4(d).

"Petitioner initially charged Respondent with violation of MRPC 1.4 by failing to keep his client 'reasonably informed about the status of a matter ... and promptly comply [ing] with reasonable request for information.'"

"Petitioner presented no evidence regarding Respondent's communication with his client, and the court therefore finds no violation of MRPC 1.4.

### *Rosen Complaint*

"Respondent deposited into his client trust account the sum of $7,324.59 upon receipt of a check in that amount from Cagley, his associate counsel in the case. Cagley prepared a hand written document entitled 'Disbursement Sheet (Draft),' which apparently was the only documentation of the outcome of the proceeding and explanation of intended disbursements from the proceeds. Petitioner's paralegal, who examined the Rosen account testified that the Respondent disbursed $2,000.00 in a check payable to Melanie Rosen on October 8, 1999. Respondent was unable to produce copies of correspondence with his client, testifying that he cannot locate that file.

"Respondent drew a check to Rosen for $584.99 that was allegedly written on October 12, 2000. However, the check, did not post to the account until December 27, 2000, two months after the checks were purportedly written, one month after Rosen's mother filed her compliant and after Respondent received notice of the Rosen complaint. After deducting the total of the three checks, $649.05 should have remained from the Rosen case. Respondent is unable to account for the money that has not been disbursed to Rosen.

"Complicating the efforts of the Petitioner to investigate the complaint was the inadequacy, and more specifically the lack of documentation of records concerning Respondent's handling of the Rosen account. Particularly notable is Respondent's failure to maintain a running ledger balance or other record keeping system with regard to the Rosen account. The evidence presented in the Rosen claim demonstrates the disarray in Respondent's practice. Respondent could not produce his file or any trust account records in that matter.

"By failing to keep complete records of his client's trust fund in this case, Respondent has violated MRPC 1.15(a) requiring that he maintain such records for five years after termination of the representation. Although Respondent is unable to produce evidence that he notified his client in writing of the outcome of the case and the remittance to which she was due, the burden to prove violation of MRPC 1.5(c) is upon the Petitioner. While the Respondent cannot show evidence that he gave such notice to his client, the Petitioner did not produce sufficient evidence to persuade the court that the Respondent did not provide such information. Petitioner has not shown by clear and convincing evidence that Respondent is in violation of MRPC 1.5(c) for failure to submit to his client a written statement upon conclusion of a contingent fee matter.

"Similarly, although there is no evidence that Respondent promptly rendered a full accounting regarding the funds which he was holding for Rosen, the Petitioner has not met its burden of showing by clear and convincing evidence that Respondent is in violation of MRPC 1.15(b) by failing to notify the client of receipt of funds. In light of the complete disarray of Respondent's records, it may well be that he has not provided such information, but the Petitioner has failed to establish that to the court's satisfaction.

"Respondent did forward a payment of $2,000.00 to Rosen giving some notice reasonably soon after the receipt of funds. Respondent received client funds in August of 1999. Through his efforts, almost a year later, he achieved a substantial reduction in one of the client's obligations in connection with the litigation. Even taking into account the financial benefit of that delay, the fact that Respondent still had client funds in his account more than one year after their receipt and four months after his compromise of that claim establishes by clear and convincing evidence that Respondent is in violation of MRPC 1.15(b) by failing to deliver promptly to the client funds which he held on her behalf.

"Respondent admits that he wrote two checks for his own benefit for a total of $1,900.00. These checks were drawn upon the Respondent's client trust account and resulted in an improper disbursement of funds from the Rosen case. The transfer of those funds from his client trust account caused the balance in the trust account to drop below the balance necessary to maintain the funds of the Rosen case. The Respondent violated Maryland Rule 16–609 which prohibits an attorney from 'borrow[ing]' or 'us[ing] any funds for any unauthorized purpose' and Maryland Code, Business Occupations and Professional[sic] Article § 10–306 which prohibits a lawyer from using trust money for any purpose other than that for which the money is entrusted to the lawyer.

### *Withholding Tax Complaint:*

"Respondent has willfully and regularly failed to comply with his obligation as an employer for the last several years, by failing to withhold State income tax from the wages of his employees, and to hold such funds in trust for the State. His failures are conduct prejudicial to the administration of justice.  Respondent has violated Rules 8.4(a) and (d).

"By willfully failing to withhold and pay income tax withheld Respondent has violated Tax–General Article § 13–1007(b) & (c).  The Respondent's conduct was both willful and a violation of state law.  Respondent's conduct is also in violation of the Tax–General Article § 10–906(a) & (b). Respondent has not maintained a separate ledger account for withholdings that indicates clearly: (1) the amount of income tax withheld;  and (2) that the income tax is the property of the State in violation of Tax–General Article § 10–906(c).  By failing to withhold income tax and maintain the required documentation, Respondent has also violated MRPC 1.15(b).

"Failure to comply with a known legal duty is willful conduct." *Attorney Grievance Commission v. Post,* 350 Md. 85, 93, 710 A.2d 935 (1998).  Here, as in *Post,* Respondent knew that he was "legally required to withhold funds in

trust, to promptly remit the funds to the Comptroller . . . , and to timely file returns supporting the withholdings." *Post,* 350 Md. at 93, 710 A.2d 935. Respondent failed to comply with a known legal duty.

"Most troubling is the charge that Respondent has violated Rules 8.4(b) and (c). By the language of Tax–General Article, Section 13–1007, Respondent has committed criminal acts. In the course of failing to submit withholding taxes and proper returns, he has misrepresented the status of withholding on IRS W–2 Forms. A literal reading of the rules supports Respondent's violation of Rules 8.4(b) and (c).

"The Court of Appeals in *Post, supra,* dealt with very similar conduct [although Post was not charged with violation of Rule 8.4(c) ]. There the Court did not hold that the respondent's conduct 'reflects adversely on his fitness as a lawyer.' " 350 Md. at 99, 710 A.2d 935.

"Respondent demonstrates a certain callousness toward his situation. Respondent relates his current difficulties to legitimate, significant personal problems he encountered in 1996, years before the events that gave rise to the instant complaints. Respondent does not, and could not claim ignorance of the ethical requirements of the legal profession. Even as he appeared in these proceedings, he had not brought to closure any of the matters complained of. Respondent has demonstrated reluctance to accept responsibility for his actions.

"However, while the evidence amply supports the complaints against Respondent and their seriousness, it does not support a conclusion that the Respondent has been dishonest. In managing his practice, Respondent has been inefficient, disorganized and careless to the extent of disregard of his responsibilities.

"This court accepts the sincerity of the three lawyers who testified on Respondent's behalf. Respondent's conduct, as improper as it is, should be assessed against the backdrop of more than 25 years of a very active practice.

"Therefore, while finding that Respondent, by his conduct, literally violated Rules 8.4(b) and (c), this court does not believe that Respondent's conduct clearly and convincingly is in violation of those Rules in light of *Post.*

## II. Standard of Review

In proceedings involving attorney discipline, this Court has original and complete jurisdiction. *Attorney Grievance Comm'n v. Seiden,* 373 Md. 409, 414, 818 A.2d 1108, 1111 (2003). Clear and convincing evidence must support the hearing judge's findings. *Attorney Grievance Comm'n v. Monfried,* 368 Md. 373, 388, 794 A.2d 92, 100 (2002). As a result, we review the record independently but generally accept the hearing judge's findings of fact unless they are clearly erroneous. *Attorney Grievance Comm'n v. Garfield,* 369 Md. 85, 97, 797 A.2d 757, 764 (2002). Any conclusions of law made by the hearing judge, such as whether provisions of the MRPC were violated, are subject to our de novo review. *Attorney Grievance Comm'n v. McLaughlin,* 372 Md. 467, 493, 813 A.2d 1145, 1160 (2002).

## III. Discussion

### A. Bar Counsel's Exceptions and Mininsohn's Exceptions Relating to Tax Obligations

Bar Counsel filed exceptions challenging the hearing judge's conclusion that Mininsohn did not violate Rules 8.4(b) and 8.4(c) based on his failure to withhold State income tax from his employees' wages and to hold such funds in trust for the State and to pay the income tax over to the State Comptroller as required by law. Bar Counsel disagrees with the hearing judge's conclusion that, while Mininsohn "literally violated Rules 8.4(b) and (c)," his conduct was not dishonest and thus he did not violate Rules 8.4(b) and (c). We agree with Bar Counsel.

Mininsohn, on the other hand, asserts that he did not willfully fail to withhold and pay income tax because the attorney he had hired handled his tax obligations incorrectly.

He also claims that he relied heavily on an employee who had worked for him for 11 years to prepare the proper tax forms. When this employee left Mininsohn's employment, Mininsohn says he was "not familiar with some of the specifics of the procedures involved" and, thus, failed to handle his tax obligations properly. We overrule Mininsohn's exception.

Mininsohn "willfully and regularly failed to comply with his obligation as an employer for the last several years, by failing to withhold State income tax from the wages of his employees, and to hold such funds in trust for the State." Such failures, Judge Tisdale concluded, violated Rule 8.4(a) and (d) as conduct prejudicial to the administration of justice, Sections 13–1007(b) and (c) and Sections 10–906(a) and (b) of the Tax–General Article, and Rule 1.15(b) as a failure to maintain required documentation. Judge Tisdale's findings were supported by clear and convincing evidence and, thus, are not clearly erroneous so that Mininsohn's exceptions are without merit.

We agree with Bar Counsel that, in addition to the violations Judge Tisdale found, Mininsohn also violated Rules 8.4(b) and (c). We disagree with Judge Tisdale's finding that, while Mininsohn "literally violated rules 8.4(b) and (c), . . . [his] conduct clearly and convincingly [was not] in violation of those rules in light of *[Attorney Grievance Comm'n] v. Post,* [350 Md. 85, 710 A.2d 935 (1998) ]." Mininsohn had maintained a withholding tax account with the State of Maryland since 1995. Tax liens were filed against him in September 1995 and October 1996 for delinquent payment of income tax reported as being withheld from his employees' wages. By means of a bank garnishment, the two liens were satisfied in October 1998.

Mininsohn also did not file the required periodic reports after January 1999. From January 1, 1999 to January 31, 2003, Mininsohn remitted withholding taxes only once when he remitted withholding taxes for $248.31 in January 1999. Further, in that forty-nine month period, Mininsohn failed to file the reports in thirty-seven of the months, even though his

year end reports for 1999–2000 prepared by an accounting service showed that he had employees during those years from whom he had withheld taxes.

On November 6, 2000, the Comptroller filed a lien against Mininsohn for unpaid withholding tax for 1999 for a total of $2,492.25, including interest and penalties. On February 25, 2003, the Comptroller filed another lien against Mininsohn for a total of $7,684.40 for 1999 through 2001. When testimony and argument concluded before Judge Tisdale regarding this matter, Mininsohn had not entered into any payment plan with the Comptroller.

■ We agree with Judge Tisdale that Mininsohn willfully failed to comply with his tax obligations. "[W]illfulness may be established merely by proving a voluntary, intentional violation of a known legal duty." *Attorney Grievance Comm'n v. Boyd*, 333 Md. 298, 309, 635 A.2d 382, 387 (1994). "[T]he duty of an employer to file withholding· returns and pay withheld taxes is a known legal duty. . . ." *Id.*

We also have concluded that, when an attorney neglects statutory tax obligations, it ordinarily reflects adversely on his or her honesty or fitness to practice law. *Attorney Grievance Comm'n v. O'Toole*, 379 Md. 595, 843 A.2d 50 (2004); *Attorney Grievance Comm'n v. Angst*, 369 Md. 404, 419–20, 800 A.2d 747, 756–57 (2002); *Attorney Grievance Comm'n v. Atkinson*, 357 Md. 646, 655–66, 745 A.2d 1086, 1091 (2000). Judge Tisdale, however, relies on *Attorney Grievance Comm'n v. Post*, 350 Md. 85, 710 A.2d 935 (1998) to exempt Mininsohn from this general rule and to conclude that he did not violate 8.4(b) and (c). We believe *Post* is distinguishable because Mininsohn's circumstances differ significantly from Post's.

In *Post*, we observed that Rule 8.4(b) contemplates that the criminal act "reflect adversely on the character traits or fitness as a lawyer, [and that] it follows that what the Rule contemplates is that the criminal act evidence another character trait, which, like honesty and trustworthiness, is relevant or critical to the practice of law." *Id.* at 97, 710 A.2d at 941. We then concluded that, "under the circumstances of [Post's]

case," his conduct did not reflect adversely on his fitness as a lawyer because his problems were due to his lack of organizational skills, this was his first encounter with the lawyer discipline system, he was a man of good character, and he maintained, as required by Section 10–906(c) of the Tax–General Article, separate employee accounts. *Id.* at 99–100, 710 A.2d at 942.

Mininsohn's conduct, on the other hand, reflects adversely on his fitness as a lawyer. Unlike Post, Mininsohn did not maintain separate ledger accounts indicating clearly the amount of income tax withheld and that the income tax was the property of the state; he has refused to take responsibility for his failure to comply with his tax obligations, blaming, instead, his tax lawyer and his former administrative assistant; he has been reprimanded on a prior occasion; and he has several complaints against him.

Moreover, Mininsohn "acknowledges that he did not respond to the Comptroller's efforts to communicate with him in a diligent manner." State tax liens were filed in 1995 and 1996 against Mininsohn. In 2000, the Comptroller filed another lien for failure to withhold taxes in 1999. In 2003, the Comptroller filed a cumulative lien against Mininsohn for the years 1999 through 2001. In short, the Comptroller has had to file four Notices of Lien of Judgment against Mininsohn, evidencing a pattern of delinquency and callous neglect exceeding that which we found in *Post* and which is more comparable to the conduct we found in *Atkinson,* 357 Md. at 654, 745 A.2d at 1090.

In *Atkinson,* we distinguished *Post* and found that the attorney had violated 8.4(b) because Atkinson had

purposefully avoided almost all contact with both the state and federal income taxing authorities and at no point exhibited, over a period of eleven years, any real intention to fulfill her duties of filing the required returns and paying the taxes due, until the authorities discovered her delinquency and contacted her."

*Id.* Mininsohn's repeated avoidance of his tax obligations and his lack of response to the Comptroller indicates that he, like Atkinson, lacked any real intention of fulfilling his duties. Such conduct reflects adversely on Mininsohn's character and demonstrates a lack of fitness to practice law. We, thus, sustain Bar Counsel's exception and find that Mininsohn violated 8.4(b).

For similar reasons, we also agree with Bar Counsel that Mininsohn violated 8.4(c). In *Angst,* 369 Md. at 419–20, 800 A.2d at 756–57, we concluded that the attorney's "dishonest and evasive conduct clearly evidence his lack of fitness to continue in the practice of law," and found that he violated, in addition to other rules, Rule 8.4(c) and (d). We noted that the attorney had "engaged in a repeated pattern of delinquency ... by failing to make the appropriate employee withholding tax payments." *Id.* at 419, 800 A.2d at 756. We also observed that the attorney "treated the delinquency notices and other inquiries from the Comptroller" with "neglect," "forcing the Comptroller to resort to filing a Notice of Lien of Judgment." *Id.* at 420, 800 A.2d at 756. "Such conduct," we found, "exemplifies respondent's lack of honesty and proclivity for engaging in conduct prejudicial to the administration of justice." *Id.* As we have pointed out *supra,* Mininsohn repeatedly failed to make the appropriate employee withholding tax payments and treated the Comptroller's efforts to communicate his delinquencies to him with neglect.

We, therefore, sustain Bar Counsel's exceptions, overrule Mininsohn's exceptions, and find that Mininsohn violated Rule 8.4(c) in addition to Rule 8.4(b).

## B. Other Exceptions

Mininsohn filed several other exceptions. Regarding the Reuschling complaint, he contends that his failure to appear in court on two occasions did not violate Rule 3.4(c) because, in the first instance, he testified he was not aware of the court date, and, in the second instance, he testified that he failed to appear in court because of an ice storm and notified the court clerk to that effect. Regarding the Leu–Gearhart complaint,

Mininsohn also argues that he did not violate Rule 1.3 because he mistakenly believed that opposing counsel intended to prepare an Order at the direction of the court instead of him. Regarding the Rosen complaint, he further asserts that he did not violate Rule 1.15(b) because he had resolved all outstanding payments he had been required to make on a client's behalf. We disagree with Mininsohn, and we shall discuss each of his exceptions in turn.

In the Reuschling matter, Mininsohn failed to appear in court on two occasions in a matter in which he personally was being sued by Reuschling. On June 29, 2000, Schwedt, Reushling's attorney, engaged a private process server to serve Mininsohn personally with two writs and an order directing him to appear for oral examination on August 23, 2000. Mininsohn failed to answer either writ, to file a motion asserting a defense or objection, and to appear for oral examination. After Mininsohn failed to appear, Schwedt called him to ask him why he was not in court. According to Mininsohn, he told Schwedt that he "was not aware of the August 23 hearing date." At the hearing on August 23, a show cause order was issued directing Mininsohn to appear in court on November 15, 2000. Mininsohn appeared in court on November 15, but he did not bring with him the records he had been ordered to produce so he was ordered to appear again on December 20, 2000.

On December 20, 2000, Mininsohn failed to appear in court a second time. Mininsohn testified that he failed to appear in court because of an ice storm. He also claims that he notified the court clerk to that effect. In his findings, Judge Tisdale observed that "there is no mention of a call to the court in the written motion to rescind body attachment that [Mininsohn] filed on January 5, 2001."

Rule 3.4(c) provides that a lawyer shall not "knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists." We are not persuaded by Mininsohn's contentions and agree with Judge Tisdale that Mininsohn violated Rule

3.4(c) when he "repeatedly failed to appear in court and to produce documents as directed by court order." *See Attorney Grievance Comm'n v. McCoy,* 369 Md. 226, 235, 798 A.2d 1132, 1137 (2002)(sustaining the hearing court's findings that Rule 3.4(c) was violated when the attorney failed to provide requested accounting records from his law practice).

With respect to his violation of Rule 1.3 arising out of the Leu–Gearhart complaint, Mininsohn argues that he did not violate Rule 1.3 because he mistakenly believed that opposing counsel had the obligation, instead of him, to prepare an Order as directed by the court. On October 3, 1997, Judge Dwyer directed Mininsohn to prepare an Order incorporating the terms of the parties' agreement. As Judge Tisdale found, the correspondence between Mininsohn and the other attorneys involved in the case reveals that Mininsohn knew that he had the obligation to prepare a draft Order. On November 4, 1997, for example, one of the opposing attorneys wrote a letter to Mininsohn, requesting that he "strike the final paragraph and resubmit the revised proposed Order." On December 21, 1999, Mininsohn himself states in a letter to another counsel that "[i]t appears that it may have been my responsibility to draft that Order." In another letter, dated January 18, 2000, Mininsohn asks the attorney to review the draft Order, stating "I will then forward it to Judge Dwyer for signature."

Rule 1.3 requires that "[a] lawyer shall act with reasonable diligence and promptness in representing a client." Mininsohn's failure to prepare and submit a draft Order indicates a lack of reasonable diligence on his part. His effort to suggest that he "mistakenly" believed that opposing counsel had the obligation to prepare the Order was belied by the evidence in the record demonstrating that he was aware that he had been directed by Judge Dwyer to submit a draft Order. Furthermore, if Mininsohn had been confused about his obligation, due diligence required him to clarify his role in preparing the Order to ensure that it was properly submitted. *See Attorney Grievance Comm'n v. Granger,* 374 Md. 438, 448, 452, 823 A.2d 611, 617, 620 (2003)(finding a violation of Rule

1.3 when the attorney never made any inquiries to determine if his client's bankruptcy petition had been filed properly).

Mininsohn also takes exception to the hearing judge's conclusion with respect to the Rosen complaint that he violated Rule 1.15(b), arguing that "one of the reasons for the delay in finalizing disbursements was the negotiation of a reduction of [one of the liens]" and that all outstanding payments he had been required to make on a client's behalf had been resolved. As Judge Tisdale notes, Mininsohn retained client funds in his account for more than one year after receiving them and four months after he negotiated the reduction of one of the client's liens. We agree with Judge Tisdale that Mininsohn violated Rule 1.15(b) "by failing to deliver promptly to the client funds which he held on her behalf." Holding a client's funds for longer than a year in these circumstances is not prompt delivery under Rule 1.15(b). *See Attorney Grievance Comm'n v. David,* 331 Md. 317, 320–21, 323, 628 A.2d 178, 180–81 (1993)(concluding that the attorney's failure to return an unearned fee for nine months and to timely remit funds received on a client's behalf indicated "serious neglect and inattention").

## IV. Sanction

As we have often stated, we discipline attorneys to protect the public and to safeguard the public's confidence in the legal profession. *Attorney Grievance Comm'n v. Thompson,* 376 Md. 500, 519, 830 A.2d 474, 485 (2003). When considering the appropriate sanction, we take into account "the particular facts and circumstances" of each case. *Id.* Given the nature and extent of Mininsohn's conduct and the existence of several aggravating factors, we shall impose the sanction of disbarment.

Ordinarily, disbarment follows any unmitigated misappropriation of funds. *See Attorney Grievance Comm'n v. Hayes,* 367 Md. 504, 512, 789 A.2d 119, 124 (2002). With respect to the hearing judge's finding that Mininsohn lacked dishonest intent, we observe that the lack of intent means only

that disbarment does not follow as a matter of course. *See id.* at 519, 789 A.2d at 128–29. A finding of lack of dishonest intent does not foreclose the imposition of the sanction of disbarment altogether.

Rather, as we explained in *Hayes,* Standard 5.11 of the American Bar Association Standards for Imposing Lawyer Sanctions (1986) provides that disbarment may be appropriate when:

(a) a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses; or

(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

*Hayes,* 367 Md. at 511–512, 789 A.2d at 124.

In this case, Mininsohn violated Rules 8.4(a), (b), (c), and (d), by his misconduct, and Sections 10–906(a), (b), and (c) and 13–1007(b) and (c) of the Tax–General Article, by failing to pay taxes, withhold taxes, and file withholding tax forms and payroll withholding taxes, and he did so repeatedly. State tax liens were filed in 1995 and 1996 against Mininsohn. In 2000, the Comptroller filed another lien for failure to withhold taxes in 1999. In 2003, the Comptroller filed a cumulative lien against Mininsohn for the years 1999 through 2001. In short, the Comptroller has had to file four Notices of Lien of Judgment against Mininsohn, evidencing a pattern of delinquency and callous neglect exceeding that which we found in *Angst.*

Mininsohn's conduct also exceeds that found in *Attorney Grievance Comm'n v. Clark,* 363 Md. 169, 767 A.2d 865 (2001) and *Post,* both failure-to-withhold cases where we imposed

indefinite suspensions. In *Clark*, we determined that the sanction of disbarment was not warranted because several mitigating factors were present, namely that

> there had never been a finding of fraudulent intent on the part of the respondent, that the respondent, while often late, never sought to avoid his obligation to file returns or remit taxes, and finally, that, as of the time of oral argument before this Court, respondent was current on—or in this case, had completed—the payment plan with the Comptroller."

363 Md. at 184–85, 767 A.2d at 873–74 (noting also that the attorney had attempted to come into compliance with the withholding tax requirements on several occasions and had taken additional steps to ensure that the violations would not recur).

Similarly, in *Post*, we declined to impose disbarment because Bar Counsel "readily acknowledged that [the] [r]espondent ha[d] been cooperative in the investigations of this complaint and ... [had] never been the subject of prior disciplinary actions by Maryland Bar Counsel." *Post*, 350 Md. at 91–92, 710 A.2d at 938. In addition, we noted that Post was found to be "a man of good character, a truthful person, and a good attorney who has given his clients good advice and has served them well" and that he "maintained the separate employee payroll accounts as required by § 10–906." *Id.* at 92, 710 A.2d at 938. Mininsohn's conduct, in contrast, demonstrates an extensive pattern of indifference that, as in *Angst*, "exemplifies ... [a] lack of honesty and proclivity for engaging in conduct prejudicial to the administration of justice." *Angst*, 369 at 420, 800 A.2d at 756. Such a pattern of misconduct also may serve as an aggravating factor under Section 9.22(c) of the ABA Standards.

We believe also that Mininsohn's conduct is distinguishable from the attorney's conduct in *Hayes*, where we concluded that the sanction of disbarment was not warranted because the hearing judge found that the attorney lacked dishonest intent when he made personal use of client funds. Hayes was

charged with violating Rules1.15(a), 8.4(a), Maryland Rules 16–607 and 16–609, and Section 10–306 of the Business Occupations and Professions Article. 367 Md. at 506–07, 789 A.2d at 120–21. The hearing judge concluded that all of the charges had been proven, based upon his findings that Hayes had settled a medical malpractice action on behalf of a homeless person whom he could not find and for whom he had done *pro bono* work, commingled client funds with his own funds and drew a check from the trust fund payable to cash on four occasions. *Id.* at 508–09, 789 A.2d at 122. The hearing judge also found several mitigating factors, with which this Court agreed:

> the respondent's candor in acknowledging his misuse of the attorney trust account; only one client was involved in the misconduct; the misconduct occurred while the respondent was attempting to assist the client, without compensation, in a matter unrelated to the matter in which he represented the client; the fact that, when he lost track of him, the respondent undertook to locate the client so that funds belonging to him could be returned; the respondent's participation in the Maryland Volunteer Lawyers Services and willingness to handle pro bono cases and the respondent's good character, as attested to by a number of character witnesses, including two former Circuit Court judges. In addition, the hearing judge credited the testimony of Dr. Wendy Zimmerman, a licensed psychologist. She testified that the respondent suffers from attention deficit disorder. . . .

*Id.* at 509–510, 789 A.2d at 123. These findings, in addition to the absence of a finding of a violation of 8.4(c), as well as the lack of dishonest or fraudulent intent, led us to conclude in *Hayes* that "the automatic disbarment rule for misappropriation [did] not apply." *Id.* at 519, 789 A.2d at 128. We, therefore, ordered that Hayes be indefinitely suspended from the practice of law with the right to seek reinstatement after 90 days. *Id.* at 520, 789 A.2d at 129. As we shall explore, unlike Hayes, Mininsohn does not escape the automatic dis-

barment rule for misappropriation because several aggravating factors exacerbate his case.

When considering whether to impose the sanction of disbarment, we have taken into account the aggravating factors found in Standard 9.22 of the American Bar Association Standards for Imposing Lawyer Sanctions (1991)(hereinafter "ABA Standards"). *Attorney Grievance Comm'n v. Harris,* 371 Md. 510, 553, 810 A.2d 457 (2002). These factors include:

(a) prior disciplinary offenses;

(b) dishonest or selfish motive;

(c) a pattern of misconduct;

(d) multiple offenses;

(e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;

(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;

(g) refusal to acknowledge wrongful nature of conduct;

(h) vulnerability of victim;

(i) substantial experience in the practice of law;

(j) indifference to making restitution.

A myriad of these aggravating factors are present in this case. First, Mininsohn has a prior disciplinary offense. In August 2003, after Bar Counsel investigated a client's complaint in a family law matter, Mininsohn accepted a reprimand. In the earlier matter, Mininsohn failed to deposit the advance retainer of $1,500 in his trust account, failed to render a full accounting to the client, failed to refund promptly the unearned portion of the retainer, and failed to respond to the lawful demands by Bar Counsel for information concerning the client's complaint. This conduct, resulting in a reprimand, is similar to the case *sub judice,* demonstrating Mininsohn's "disdain for his professional responsibility" and "a certain callousness toward his situation."

Another aggravating factor is apparent in Mininsohn's refusal "to acknowledge the wrongful nature" of his conduct.

*See* ABA Standard 9.22(g). Judge Tisdale described Mininsohn as exhibiting "a certain callousness toward his situation" and a "reluctance to accept responsibility for his actions." That remorselessness exacerbates the egregiousness of Mininsohn's conduct.

With almost twenty-five years experience at the bar, Mininsohn also has "substantial experience in the practice of law." *See* ABA Standard 9.22(i). Inexperience had nothing to do with Mininsohn's conduct; in fact, one of his witnesses testified that Mininsohn had taught him how to properly account for disbursements from the recovery in a personal injury case. Unlike *Attorney Grievance Comm'n v. Awuah*, 346 Md. 420, 436, 697 A.2d 446, 454 (1997), where we concluded that an inexperienced attorney lacked dishonesty when he mishandled funds, Mininsohn's twenty-five years of experience does not mitigate the seriousness of his conduct. *See, e.g., Attorney Grievance Comm'n v. Garfield*, 369 Md. at 106–107, 797 A.2d at 769 (citing the respondent's "substantial experience in the practice of law" as an aggravating factor).

■ In addition to considering aggravating factors, we also weigh mitigating factors when determining the appropriate sanction. *Id.,* at 98, 797 A.2d at 764. Mininsohn had several witnesses testify as to his character. While an attorney's character or reputation may serve as a mitigating factor, *see Hayes*, 367 Md. at 510, 789 A.2d at 123, we observe that, in *Attorney Grievance Comm'n v. Vlahos*, 369 Md. 183, 185–186, 798 A.2d 555, 556 (2002), we imposed the sanction of disbarment for the misappropriation of funds in spite of the fact that many "witnesses found respondent to be trustworthy and honest" because "[i]t has long been the rule in this State that absent compelling extenuating circumstances, misappropriation by an attorney is an act infected with deceit and dishonesty and ordinarily will result in disbarment." In other words, when misappropriation of funds is at stake, which is the case here, witnesses testifying to the attorney's honesty and integrity may be less persuasive.

In sum, the general rule is that misappropriation of funds results in disbarment. In addition to many other serious violations, Mininsohn misappropriated funds that he had collected on behalf of clients as well as the Comptroller, and no "compelling extenuating circumstances" exist for an exception to be made in Mininsohn's case. The aggravating factors far outweigh the mitigating factors in this case. Therefore, we impose the sanction of disbarment.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–761, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST GARY S. MININSOHN.*

BELL, C.J. would impose an indefinite suspension.